Argued February 3, affirmed October 22, 1969, petition for
rehearing denied January 21, 1970

STROBEL, *Respondent, v.* GARRISON ET AL,
*Appellants.*

459 P. 2d 1001
464 P. 2d 688

*Frank Bosch* and *Philip A. Joss,* Portland, argued the cause for appellants. On the briefs were Joss, Bosch & Burns, Portland, and James A. Pearson, Eugene, as amicus curiae.

*James W. Durham, Jr.,* Portland, argued the cause for respondent. With him on the brief were Durham, Smith & Todd, Portland.

O'CONNELL, J.

This is a proceeding in habeas corpus brought by plaintiff to obtain the custody of her infant child. Defendants appeal from a judgment ordering defendants to deliver the child to plaintiff.

In July, 1967 plaintiff, fifteen years of age and unwed, conceived a child. In February, 1968 plaintiff entered the Salvation Army's White Shield Home for expectant unwed mothers. While there plaintiff informed the social service supervisor that she had decided to have her child adopted through a child-caring agency. The supervisor notified defendant Waverly Children's Home of plaintiff's desires, whereupon a representative from Waverly met with plaintiff and explained the services of Waverly.

On March 26, 1968 plaintiff gave birth to a child and on April 1, 1968 the Waverly representative came to the White Shield Home to obtain from plaintiff a formal surrender of the child and a consent to adoption. At that time plaintiff executed a "Surrender and Release" which is set out in the margin.[1]

---

[1] "SURRENDER AND RELEASE

"I, Vikki Lee Anderson, am the mother of Baby Boy Anderson, a male child born on the 26th day of March, 1968 at Port-

A few minutes later and as a part of the same transaction plaintiff signed a "Certificate and Waiver" which is also set out in the margin.[2]

On May 21, 1968 Waverly placed the child with prospective adoptive parents. Plaintiff married Mer-

---

land, Oregon. I was not married at the time of the conception of said child and I have not married since then.

"I hereby absolutely and permanently surrender and release all my parental right, custody, and guardianship and control to and over my said child to WAVERLY CHILDRENS HOME, a private child-caring agency incorporated and licensed under the laws of Oregon.

"I understand and agree that this surrender and release is expressly given, among other things, for the purpose of adoption, and I authorize WAVERLY CHILDRENS HOME to place said child for adoption and in my stead to give or withhold its consent to such adoption.

"I further authorize WAVERLY CHILDRENS HOME, without notice to me, to do or cause to be done any and all acts and things which it may consider to be for the best interest of said child and to appear in my place and stead in any proceeding relating to said child.

"I have read and understand this surrender and release and sign it of my own free will. I WAIVE ANY RIGHT TO RE-VOKE THIS DOCUMENT.

"Executed this 1st day of April, 1968 at 9:40 o'clock A.M.
                                    "Vikki Lee Anderson"

[2] "CERTIFICATE AND WAIVER

"I, Vikki Lee Anderson, am the mother of Baby Boy Anderson, a male child born on the 26th day of March, 1968, and have previously surrendered and released said child to WAVERLY CHILDRENS HOME.

"I hereby waive appearance and notice of any right to appear in the matter of the adoption of said child.

"I execute this certificate and it may be filed as my appearance and consent so that the court may pass upon the adoption of said child without waiting for the expiration of six months after the date of said surrender and release.

"I have read and understand this certificate and sign it of my own free will. I WAIVE ANY RIGHT TO REVOKE THIS CERTIFICATE.

"Executed this 1st day of April, 1968, at 9:47 o'clock A.M.
                                    "Vikki Lee Anderson"

rill Strobel on June 1, 1968. Merrill was not the father of her child. On June 29, 1968 plaintiff telephoned Waverly requesting the return of her child, which Waverly refused whereupon plaintiff brought this habeas corpus proceeding.

The trial court, relying upon *Dugger v. Lauless,* 216 Or 188, 338 P2d 660 (1959), held that plaintiff could withdraw her surrender and release and consent to adoption. In *Dugger v. Lauless, supra,* which involved a non-agency adoption, we held that the natural parents of the child may withdraw their consent prior to the entry of a decree of adoption unless they are estopped to do so. In the present case the trial court found that there was no basis for an estoppel.

Defendants contend that *Dugger v. Lauless, supra,* is not applicable to the present case because here the child was surrendered to a licensed child-caring agency and that in these circumstances ORS 418.270 is controlling.

ORS 418.270 provides as follows:

"(1) Incorporated private child-caring agencies may receive needy or dependent children from their parents or legal guardians for special, temporary or continued care. The parents or guardians may sign releases or surrenders giving to such organizations guardianship and control of the persons of such children during the period of such care, which may be extended until the children arrive at legal age. Such releases do not surrender the rights of such parents or guardians in respect to the adoption of such children and do not entitle such organizations to give consent to the adoption of said children unless the release or surrender expressly recites that it is given for the purpose of adoption.

"(2) Any entire severance of family ties of

such children by adoption or otherwise shall be accomplished only by the order of a court of competent jurisdiction.

"(3) It is unlawful to present a child surrendered to an agency by a parent, parents or guardian for a court to pass upon the adoption of said child until at least six months have elapsed after signing the surrender.

"(4) Parents or legal guardians of children whom they have by release or surrender agreement given into the guardianship of incorporated child-caring organizations may subsequently waive their right to personal appearance in court in matters of adoption of such children, and file their appearance and consent by a duly signed and attested certificate, which the court shall recognize as a valid basis for judicial consent in such cases, in which event, the child-caring organization may use the release or surrender as provided in subsection (1) of this section without the necessity of the six-month period having expired."

As we noted above, plaintiff signed both the surrender (reciting her consent to the adoption) as provided in subsection (1) of ORS 418.270, and waiver of appearance provided for in subsection (4).

Defendants contend that the execution of these two instruments by plaintiff fulfilled the requirements of ORS 418.270, the effect of which was to sever irrevocably plaintiff's right to the custody of her child.

■ The statute makes it clear that in the absence of the execution of a waiver of appearance and consent (subsection (4)), a child in the custody of a child-caring agency cannot be adopted until at least six months have elapsed after the parent has signed the surrender (subsection (3)). It seems apparent that this six-month moratorium was designed to give the parent who had surrendered his child to an agency

and consented to adoption the opportunity to change his mind within the six-month period. However, subsection (4) lifts the moratorium where the parents file a certificate of consent and waiver of appearance.

It will be noted that subsection (4) provides that the parents "may *subsequently* waive their right to personal appearance in court * * *." (Emphasis added.) The certificate executed by plaintiff would not toll the six-month waiting period and permit the entry of a decree irrevocably foreclosing plaintiff from regaining custody of her child unless the certificate is deemed a *subsequent* writing within the meaning of the statute.

The certificate of waiver was executed seven minutes after the execution of the surrender and release. Does this constitute a *subsequent* waiver? Defendants argue that it does, even though the certificate was executed as a part of the same transaction in which the surrender was executed.

Subsection (1) of ORS 418.270 provides, in effect, for consent to adoption as a part of the instrument of surrender. Subsection (4) provides for something more than the giving of consent; it is a provision relating to waiver of appearance in court. Thus it provides that parents "may subsequently waive their right to personal appearance *in court*" and file their appearance "and consent by a duly signed and attested certificate, which *the court* shall recognize as a valid basis for *judicial* consent in such cases * * *." (Emphasis added.)

■ We interpret this provision as requiring a waiver of appearance in a specific proceeding in which specified adoptive parents are petitioners. We do not think that the legislature intended to establish a procedure

whereby parents could waive their right to personal appearance in any adoption proceeding which might be brought by someone in the future.

This interpretation of subsection (4) fits it into the other subsections of ORS 418.270. If a parent consents to the adoption as a part of the execution of the surrender provided for in subsection (1) and six months elapses, the original consent will, upon the entry of the decree of adoption, operate to bar the parent from regaining custody of the child.

We think that this was the legislative purpose in enacting subsection (3). Six months is an adequate period of time for parents to consider the consequences of their action in giving the child-caring agency consent to adoption and to decide whether to withdraw their consent. But the legislature apparently felt that a moratorium of less than six months would be adequate if the parents were apprised of a proceeding which had been instituted to adopt their child. The parents would then be faced with the imminent loss of their child and would, presumably, give their consent by signing the certificate of waiver of appearance only after carefully reappraising their previous action in granting consent to the child-caring agency.

By requiring this subsequent waiver and consent the legislature reduced the danger of a consent given impulsively or under circumstances, such as in the present case, where the parent is under pressures or faced with alternatives which impel consent as the lesser of two immediate evils.

In the present case plaintiff did not execute a waiver of appearance as a part of a specific judicial proceeding for adoption. Under these circumstances

plaintiff has the right to regain custody of her child and for that purpose to revoke the authorization to give consent to adoption which she granted to Waverly in the "Surrender and Release," unless plaintiff was estopped to revoke this consent.

The trial court, after carefully considering the factors relevant to estoppel which we set out in *Dugger v. Lauless*, 216 Or 188, 338 P2d 660 (1959), found that plaintiff was not estopped. We agree with the trial court's conclusion.

The judgment of the trial court is affirmed.

SLOAN, J., dissenting.

The trial court decided that *Dugger et ux v. Lauless*, 1959, 216 Or 188, 338 P2d 660, compelled him to permit plaintiff to summarily withdraw her surrender of her child for purposes of adoption. That is all the trial court decided and it is the only question on appeal. It is unnecessary to decide whether or not the waiver of appearance was valid. If the consent is good, the adoption may be accomplished without a waiver. The waiver only relates to the right of the consenting parent to appear in court or to the filing and granting of a petition for adoption within the six month period. A waiver, unlike the consent, is not critical to the ultimate decree.

*Dugger et ux v. Lauless, supra,* was a non-agency case, holding that a consenting parent could withdraw consent at any time prior to the decree of adoption. It is necessary to decide here if the same rule should apply to a consent obtained by a child-caring agency. A review of the historical background of the legislative purpose and policy of the agencies, together with substantial and respected authority relating to the subject, demonstrates that these consents must

have validity. They should not be revocable except by a showing of fraud on the part of the agency.

The majority, by an unnecessarily rigid construction of the statute, virtually emasculates the legislative policy in respect to the participation of these agencies in the adoption process and the authority granted to them. The potential harm to the agencies is not difficult to foretell and it is unwarranted. The legislative policy is not difficult to find.

In 1919, by Oregon Laws 1919, ch 405, the legislature granted a quasi-official status to qualifying private child-caring agencies such as Waverly. It then imposed on these agencies substantially all of the *parens patriae* responsibility of the state for the care of the state's unwanted children. By Oregon Laws 1959, ch 429, the legislature extended to the State Public Welfare Commission "the same authority as a private child-caring agency."

With the exception of this more recent grant of the same responsibilities and duties to the State Public Welfare Commission, the private child-caring agencies have continued to carry this state's major burden as parent to unwanted children. In this instance our concern is directed at one of the more important of these functions; the authority vested in the agencies to exercise the state's judgment in receiving a valid consent for the adoption of a child.

It is of more than academic importance to know that Oregon was one of the first states to adopt a statutory procedure for the adoption of children. Clarke, Social Legislation (2d ed) 316, 1957. These early statutes (ours is found at Title IV, Deady's Code) represented a complete break in the ancient conception that adoption was for the benefit of pro-

viding heirs for childless people. Our statute, largely unchanged, along with those later adopted in other states, adopted the policy that adoption is a process of "selecting fit parents for children, not finding children for parents." Katz, Promotion of Values in the Adoption of Children, 1964, 4 Journal of Family Law, 7 at p 8. Other authorities agree that the genesis and evolution of our adoption laws is related to an increasing concern for the welfare of the child. See Huard, Law of Adoption, Ancient and Modern, 1956, 9 Vanderbilt L Rev 743, and the extensive bibliography that Professor Huard has compiled. This includes, of course, the initial determination by the agency, Waverly, in this instance, that the surrender of the child provides the best hope for the child's future and that the mother's surrender of the child, in the situation, as here, involving an unwed mother, is understandingly made.

The legislative assembly's long continuation, unchanged, of the 1919 statute (ORS 418.270) is persuasively indicative of legislative satisfaction that the agencies have used this power with restraint and judgment.

This belief in the legislative intent and policy can also be read into Oregon Laws 1967, ch 375. That chapter is an amendment to ORS 418.275, which had provided that a child-caring agency shall be the guardian of persons of all dependent and delinquent children committed to it by a permanent order of an appropriate court. The 1967 amendment specified that the agencies shall also be the guardians of the person of each child surrendered to it as provided by ORS 418.270. The Act also reiterated that when the "agency deems such action proper * * * it may

consent in *loco parentis* to the legal adoption of such children."

It seems clear to me that the legislature has recognized that the consent to adopt must have finality for otherwise the use and purpose of the agencies will be seriously impaired. These considerations have been authoritatively expressed elsewhere. Professor Katz, for example, in Promotion of Values in the Adoption of Children, *supra,* 4 Journal of Family Law, at pp 10, 11 says:

"Involvement by the government through institutions, such a public child welfare agencies or by private institutions through private agencies, is justified at the placement stage because of the community's proper concern for the child's well-being as well as that of the natural and adoptive parents. It is at this point that the community's concern is most meaningful. The court-ordered social investigation that occurs in many states after the child has been in the adoptive parents' home for anywhere from six months to a year might be too late to be healthy for the child or fair to his parents. Agency placement at the beginning of the adoption process can, in the long run, lessen the likelihood of a child's being shifted from one home to another and then to a third. It can prevent hardships and disappointments that would result if a court determined that a child ought to be removed from a home in which the prospective adoptive parents, after having the child in their home for a relatively long period of time, had become fond of him. It can provide the most adequate protection for all the parties.  *  *  *.  Many agencies find that unless the child's status is clearly ascertainable when they obtain the child, their area of functioning is uncertain. They also find that the unmarried mother who has decided to give up her child for adoption wants to be sure of the child's well-being as well as her own re-

sponsibilities or freedom from them. The belief in the field is that early voluntary termination helps toward clarity and ease of planning for the child's life. * * *."

Similar considerations are to be found in decisions by the Supreme Courts of Michigan and Texas. Each case is particularly persuasive because each court was concerned with prior opinions, like *Dugger et ux v. Lauless, supra,* which had held that in non-agency cases, the consent could be withdrawn at any time prior to a decree of adoption. In *Gonzales v. Toma,* 1951, 330 Mich 35, at 38, 39, 46 NW2d 453, the court distinguished its previous decisions by the following:

"Plaintiff also urges that, if the release was valid, it was within her power to revoke it at any time before conclusion of the adoption proceedings. As authority she cites *In re White,* 300 Mich 378 (138 ALR 1034). In that case the parents had not released the child to a licensed placement agency, and consent of the parents to the adoption was, therefore, required by statute. This Court held that the consent so given by the parents could be withdrawn at any time before the adoption had become final and absolute. In the instant case plaintiff's consent to adoption is not required under the statute, but only the consent of the society to which she released the child. The *White Case* is, therefore, not in point. The requirement of the statute that the probate judge explain to the mother of a child born out of wedlock that by execution of the release she voluntarily terminates permanently her rights to the child, and the provision that consent to adoption of such child shall be filed by the mother, *unless she shall have released the child* to a licensed placement agency, in which case the consent of such agency only is required, are eloquent of a legislative intent that the release shall terminate the parental rights per-

manently, beyond the power of the parent to revoke."

The Michigan statute placed the responsibility for the validity of the surrender on the probate court. Our legislature, as previously emphasized, has placed this confidence in the child-caring agencies.

In the Texas case, *Catholic Charities of Diocese of Galveston v. Harper,* 1960, 337 SW2d 111, the court was confronted with legislation much like our own. A somewhat recently enacted statute had granted to child-placing agencies in Texas similar authority in respect to surrenders as that found in ORS 418.270. The facts in the Texas case as reported in the cited Texas decision are identical to those in the instant case, with the exception that the mother of the children was a widow at the time the surrender was executed. Later she married and sought to withdraw the surrender and consent. And, as in the instant case, her reason was simply a change of mind.

The court held that the legislative policy expressed in the statute to secure protection to children placed for adoption and to give reliability to the process, did not permit an unfettered right to the natural mother to withdraw her consent. The court reasoned that the unquestioned legislative policy justified distinguishing its earlier decision that had held, like *Dugger et ux v. Lawless, supra,* that a consent could be withdrawn at any time prior to a decree of adoption.

The Texas court said:

"We hold that where the parents have surrendered their child to the custody of an agency licensed by the State Department of Public Welfare to place children for adoption and have given their written consent that such agency may place

the child for adoption, that consent is subject to revocation only by proof of fraud, misrepresentation, overreaching and the like." 337 SW2d at 114, 115.

That expresses the obvious legislative intent of this state as well.

It is said that the delay of six months required by subsection (3) of ORS 418.270 in presenting an adoption petition to the court is intended to give the surrendering parent that long to change her mind. This argument is also answered to my satisfaction by the Texas court:

"Even after placement, preceded by a careful and personal investigation of the character, environment, health, financial responsibility and other qualifications of the prospective adoptive parents, the child is to live in their home for a period of six months before adoption may be granted except in cases of emergency. Art. 46a, § 3. Naturally the purpose of this provision is to allow a reasonable time for an adjustment of the relations, to be sure that the child is suited to the home and that the home is suited to the needs of the child. * * *." 337 SW2d at 114.

In the instant case the trial court specifically found that there was no evidence of overreaching or fraud on the part of Waverly's personnel and that Vickie had fully understood the documents she had executed and was fully conscious of their impact. For that reason we should hold that the decree should be reversed and the petition dismissed.

PERRY, Chief Justice, joins in this dissent.

## ON PETITION FOR REHEARING

PER CURIAM.

The defendants have petitioned for a rehearing and assert that if our former opinion is allowed to stand it will have "disastrous effects."

■ At the outset we wish to emphasize that the Oregon legislature at an early day exercised its power to authorize and regulate the adoption of children. Since the legislature has enacted statutes prescribing how adoptions shall be accomplished, this court has no power to change in any particular the law as expressed in those statutes. They bind this court as well as the litigants with equal force. The role of this court is limited to construing the adoption statutes and attempting to ascertain the meaning of the legislature as expressed therein. That has been our only role in this case.

■ In discharging that function we have re-examined with meticulous care the applicable statutes and conclude that in our former opinion we interpreted them in accord with the intention of the legislature by which they were enacted. If social changes since 1919 have created a need for revision of the adoption code, such revision is the responsibility of the legislature.

We are not unmindful of the concern which must be felt by those who have custody of children for the purposes of adoption. We have observed, however, that the concern registered by many adoptive parents is wholly unwarranted. In the first place it is to be noted that the statute, and our interpretation of it, relates only to adoptions effected through child-caring agencies and does not in any way affect adoptions privately arranged. *Dugger et ux v. Lawless,* 216 Or 188, 338 P2d 660 (1959) sets forth the principles governing the power of the natural parent to revoke an adoption privately arranged. It is clear from what

we said in that case that the power of the natural parent to revoke consent to adoption is a limited one.

■ Where the adoption is effected through a child-caring agency the power of the natural parent to revoke his or her consent to adoption is also confined to relatively limited circumstances. As we indicated in our former opinion if a parent, in surrendering a child to a child-caring agency, consents to adoption, a decree entered upon the expiration of six months operates to bar the parent from regaining custody of the child.

■ A question may arise as to whether the power to revoke is terminated upon the expiration of six months where an ineffective waiver of appearance has been filed but nevertheless a decree of adoption has been entered within the six-month period. As we have interpreted the statute, the six months is a period to which the parent is entitled for the purpose of reconsidering the import of the authorization given to the child-caring agency to let the child out for adoption. The only way in which this period may be cut short is by the execution of an effective waiver of appearance as we have discussed above. Therefore, a decree entered within this period without the benefit of the parent's waiver of appearance would be vulnerable to direct attack by the parent within the six-month period. The erroneous entry of such a decree should not, however, operate to give the parent a greater period for reconsideration than that granted by the statute. If the parent has let the six months go by without revoking the authority of the child-caring agency, the legislative purpose would not require that he be allowed thereafter to attack a premature decree on this ground. The parent having taken no action within the period granted for reflec-

tion by the statute, the protection to which he is entitled would be at an end. No valid purpose would be served by treating such a decree as fatally defective and open to later attack.

■ In our former opinion we held that the statutory provision for waiver of appearance meant "a waiver of appearance in a specific proceeding in which specified adoptive parents are petitioners," as contrasted with a waiver of appearance to be used at some future time in a proceeding brought by persons not known at the time the waiver was executed. Defendants and amici curiae, including the Attorney General, argue that our interpretation of the statute results in destroying the anonymity of the natural and adoptive parents and therefore runs counter to the policy of statutes providing for the confidentiality of adoptions. Defendants misinterpret our opinion. A waiver of appearance may be executed in a specific adoption proceeding without disclosing the names of the present and prospective parents.[1] This practice has been employed in Oregon in innumerable adoption cases. Although so-called "blanket" consents (consents which do not name the prospective adoptive parents) are not uniformly upheld in the various states,[2] this court

---

[1] An adoption proceeding may be, and usually is, captioned "In the Matter of the Adoption of (name of child)." Thus a waiver of appearance to a proceeding so designated need not disclose the names of the natural or adoptive parents.

[2] "* * * The cases upholding blanket consents are both more numerous and better reasoned. They point out that it is the court, in passing on the adoption, not the natural parent, who chooses and approves the adoptive parent, and that therefore there is no significant purpose to be served by inserting the adoptive parents' names in the consent. In fact there is every reason not to do so, as has been suggested. And adoption statutes should not be construed strictly but sensibly, in such a way as to protect the interests of all parties." Clark, Jr., Law of Domestic Relations § 18.4, pp. 622-23 (1968).

has recognized their validity. Thus in *Williams et ux v. Capparelli*, 180 Or 41, 44-45, 175 P2d 153 (1946) the court rejected counsel's contention that "concealment of the identity of the proposed foster parents vitiated consent."

Much of the defendants' argument is devoted to a recitation of the practical difficulties which will flow from permitting the natural mother to revoke her consent. We can only repeat that these are matters for legislative treatment.

The petition for rehearing is denied.

Chief Justice PERRY, and Justices SLOAN and TONGUE would grant the rehearing.