In the Matter of the Adoption of
Baby Girl J., minor
C. et ux, *Respondents,*
*v.*
J., *Appellant.*
(No. 29,561, CA 10385)
583 P2d 22

Don A. Dickey, Salem, argued the cause for appellant. With him on the brief was Douglas, Grim & Carson, P.C., Salem.

Paul Lipscomb, Salem, argued the cause for the respondents. On the brief were John W. Jensen, and Blair & MacDonald, Salem.

Before Schwab, Chief Judge, and Lee, Richardson and Joseph, Judges.

JOSEPH, J.

**JOSEPH, J.**

The issue in this case is whether appellant should have been allowed, more than three months after the child had been released to live with the adoptive parents, to revoke her voluntary and knowing consent to the private placement adoption of her infant daughter. The trial court ruled that appellant was estopped from revoking her consent and entered an adoption decree.

Appellant was an unmarried, 18-year-old college student when the child was conceived. In January, 1977, when she learned of her pregnancy from a nurse at the college health center, she stated that she planned to give the child up for adoption. She and the father had no plans to marry, and she had decided against abortion. She was referred to a physician who was also treating one of the respondents. After conferring with the physician, appellant told him she thought it would be best to release the child for adoption.[1] In March, 1977, she briefly changed her mind and decided she would like to keep the child when it was born. Then, after talking with the child's father and with the school chaplain, she again decided adoption would be best. In May, 1977, her physician sent her to the attorney representing respondents. After conferring with the attorney, she reaffirmed her adoption decision. Respondents were told that a child would be available in August, and they began to make the necessary arrangements.

On August 10, 1977, the day after the child was born, an attorney retained by respondents to represent appellant went to her room with the adoption consent form. He explained that he was there to represent her.

---

[1] At the hearing below she summarized her reasons for deciding on adoption:

> "Well, I felt that it would be very hard to have a child without the support of the father and I also had not told my family or anyone in my family and I felt that I would be disgracing my family if I had the child and I wanted to spare them that * * *."

He carefully read the form to her (deleting the names of the adoptive parents)[2] and explained its significance. She told him she had thought about the matter for a long time; she signed the form. It is conceded that she fully understood the significance of the consent and that it was not signed as a result of fraud, duress or any improper influence. On the same day respondents filed an adoption petition.

On August 12, respondents took custody of the child directly from the hospital. Appellant had seen her only once. Although the baby had had normal infant illnesses, at the time of the hearing in January, 1978, she was healthy and developing normally. In addition to the costs of caring for the child, respondents had paid medical and hospital expenses for appellant and the child and legal fees, totalling approximately $1,600.

A Children's Services Division caseworker separately interviewed appellant and respondents in mid- or late October, 1977, less than a month before appellant decided to revoke her consent. The caseworker reported that

> "[t]he natural mother is aware of the significance of the action she is taking. She is satisfied with her decision and she wants the child to know that she desired to keep her but did not consider this feasible as the natural mother was not prepared to assume this responsibility at this time."

The caseworker approved the adoption.

In mid-November appellant changed her mind. She testified that her change of mind was prompted in part by the natural father's change of mind. In September he apparently decided for the first time that he was

---

[2]Concealment of the identity of the proposed adoptive parents does not vitiate the consent. *Strobel v. Garrison,* 255 Or 16, 459 P2d 1001, 464 P2d 688 (1970).

opposed to the adoption,[3] but it is not clear that he was prepared to marry appellant or to help support the child. She at first told respondents' attorney to proceed with the adoption despite the natural father's opposition. On about November 14, however, appellant called her mother in Florida and for the first time told her that she had had a child. Her mother was also opposed to the adoption. Appellant and the child's father then went to an attorney, and on November 17 a letter was sent to respondents' attorney notifying him of appellant's intent to revoke her consent. On November 30, appellant filed a revocation of consent and objection to the adoption.

At the hearing appellant testified that she had no plans to marry. Her intention was to remain in school until the end of the semester and then go to live with her mother. Her income was approximately $300 per month in benefits payable as a result of her father's death, plus money she earned at part-time jobs. She expected to receive no support from the child's father.

Respondents, both 27 years of age, have been married since 1971. No challenge to their capacities or fitness to be adoptive parents has even been suggested.

The trial court concluded:

"After consideration of all the evidence, and the rights of the petitioners, of the mother, and of the child, I find that it is in the best interests of the child to grant the petition of adoption.

"I am cognizant of and sympathetic to [appellant's] concern for the child and her efforts to recover it, but she voluntarily surrendered it to petitioners, and waiting 90

---

[3]The natural father's consent was never obtained. The trial court, however, made the following findings:

"[T]he natural Father of said child was not married to the Mother of the child at the time of the conception or birth of said child, and * * * the Father of said child has not resided with the Mother of the child or with the child since the birth of the child and the Father has not contributed or endeavored to contribute to the support of said child at any time, and * * * the natural Father has not established the minimal statutory ties with the child and thus is not entitled to notice herein."

days after the child's birth before indicating her intention to revoke, she cannot under the circumstances established by the evidence where it is for the best interests of the child to become a member of petitioners' family. She cannot arbitrarily change her mind and thus, desolate the plans of the petitioners and bring to naught all of their time, effort, expense and emotional involvement."

When a natural parent seeks to revoke consent to adoption prior to entry of an adoption decree, the trial court has discretion under all the circumstances to determine whether revocation should be allowed. *Dugger et ux v. Lauless,* 216 Or 188, 338 P2d 660 (1959). In making the determination, a number of factors should be considered, including

"\* \* \* the circumstances under which the consent was given; the length of time elapsing, and the conduct of the parties, between the giving of consent and the attempted withdrawal; whether or not the withdrawal of consent was made before or after the institution of adoption proceedings; the nature of the natural parent's conduct with respect to the child both before and after consenting to its adoption; and the 'vested rights' of the proposed adoptive parents with respect to the child." *Williams et ux v. Capparelli,* 180 Or 41, 45-46, 175 P2d 153, 155 (1946).

The relative abilities of the adoptive and natural parents "to rear the child in the manner best suited to its normal development"[4] may also be significant. *Dugger et ux v. Lauless, supra.* In all cases the welfare of the child is of primary importance. In reviewing cases such as this, as in reviewing termination of parental rights cases (*State ex rel Juv. Dept. v. Maves,* 33 Or App 411, 576 P2d 826 (1978)) and dissolution cases (*McCoy and McCoy,* 28 Or App 919, 562 P2d 207, 29 Or App 287, 563 P2d 738 (1977)), we give due regard to the findings of the trial court, which had the opportunity to see and hear the witnesses.

---

[4] *Williams et ux v. Capparelli,* 180 Or 41, 46, 175 P2d 153 (1946).

In *Curran v. Vaida,* 34 Or App 631, 637, 579 P2d 313 (1978), we noted that

> "[k]nowing and voluntary consent by a child's parent or parents is the basis of the adoption process. The integrity of the private placement system requires that such consent be scrupulously obtained."

That basic requirement was undoubtedly satisfied in this instance. Appellant is intelligent and well-educated. She deliberated about the matter for months and discussed her decision with several friends and experienced professionals. Although her consent was given only one day after the child was born—which is a circumstantial characteristic of the private placement system—she was provided with independent legal representation at the time, she fully understood both the significance of the consent and that the adoptive parents would rely upon it in taking custody of the child directly from the hospital, and she was motivated by no improper influence.

It is difficult in cases such as this to balance the interests of natural parent, adoptive parents and child. It is particularly difficult to determine upon the limited information typically presented in the record whether the child will ultimately be better off having been raised by the natural parent or by the adoptive parents. We do recognize the natural bond between mother and child. However, as one commentator has observed:

> "All other things being equal, the notion of the innate superiority of the natural parents might be valid. But in the adoption situation all things are seldom equal." Comment, *Revocation of Parental Consent to Adoption: Legal Doctrine and Social Policy,* 28 Chi L Rev 564, 570 (1961).

Appellant herself decided early that adoption would be in the child's best interests. Prior to her change of mind in November, 1977, she wavered from that decision only for a brief time. For more than three months after the child's birth she gave no indication of dissatisfaction with her decision. In fact, as late as

October, 1977, she reaffirmed that decision, stating that she was not ready to take responsibility for the child.

Petitioners have from the outset demonstrated their willingness to take responsibility for the child and to provide her with care and affection. The child was with them almost from birth. In the months before appellant's notification of intent to revoke consent they developed strong emotional ties with her. We know that she received good care and was progressing normally. An expert witness testified concerning the possible adverse emotional effects upon the child and the petitioners if the child was removed from them. He noted that the impact upon the child might only be temporary, but that the impact upon petitioners would be permanent and similar to the impact of the death of a child.

The primary purpose of adoption is not to provide children for persons who are unable to have their own, but to find able and caring parents for children. *See Strobel v. Garrison,* 255 Or 16, 25, 459 P2d 1001, 464 P2d 688 (1970) (Sloan, J., dissenting). If adoptive parents are to be expected to make the full commitment which is vital to the child's welfare, the consent of the natural parent or parents must at some point become final. We agree with the trial court that under the circumstances that point was reached prior to appellant's attempted revocation.[5]

---

[5] Appellant argues that the legislature has in effect established a six-month period in agency adoptions during which the natural parent can revoke consent (ORS 418.270), and that by analogy a natural parent who has consented to a private placement adoption should be allowed the same period in which to change her mind. ORS 418.270 is not as simple as appellant would make it seem. ORS 418.270(4) itself is designed to protect the interests of the adoptive parents by permitting the consent of the natural parent to be made irrevocable upon placement of the child. In this instance, appellant knew that the adoptive parents would immediately rely upon the consent to take custody of the child and to initiate an adoption proceeding, and she waived "notice required by law in connection with these adoption proceedings and all right to personal appearance in any

Affirmed.

court in the matter of the adoption of the said child." The Supreme Court has made it clear, moreover, that ORS 418.270

"* * * relates only to adoptions effected through child-caring agencies and does not in any way affect adoptions privately arranged. *Dugger et ux v. Lauless,* 216 Or 188, 338 P2d 660 (1959) sets forth the principles governing the power of the natural parent to revoke an adoption privately arranged. It is clear from what we said in that case that the power of the natural parent to revoke consent to adoption is a limited one." *Strobel v. Garrison, supra,* 255 Or at 32-33.