Argued and submitted February 25, affirmed April 21, petition for review allowed September 9, 1999 (329 Or 352)

In the Matter of
Aja Juan Hayes, a Minor Child.

Karene McCULLEY
and Eugene Forte,
*Petitioners,*

*v.*

Lolita BONE,
*Respondent.*

(970304; CA A100393)

979 P2d 779

John Chally argued the cause and filed the briefs for appellants.

Ellen Mendoza argued the cause and filed the brief for respondent.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

LINDER, J.

De Muniz, P. J., concurring.

**LINDER, J.**

This case involves the private adoption in Oregon of a child born in Arkansas. The biological mother filed a motion in the Oregon trial court to set aside the adoption decree on grounds relating to the court's jurisdiction and the validity of mother's consent. Prospective adoptive parents disputed mother's ability to challenge the decree after its entry and after the time for appeal had run. Adoptive parents also contested the grounds on which mother sought to have the decree set aside. The trial court decided that it had subject matter jurisdiction over the adoption but concluded that mother was entitled to challenge the decree and that mother effectively had revoked consent to the adoption. The trial court therefore set aside the decree, dismissed the adoption petition, and entered a writ directing adoptive parents to return child to mother. Adoptive parents appeal, challenging the trial court's decision on the merits. Mother cross-assigns error to the trial court's decision regarding jurisdiction. We review the facts *de novo,* ORS 19.125(3), and the legal issues for errors of law. For the reasons that follow, we affirm.

Mother gave birth to child in Arkansas on July 4, 1996. Mother was then 25 years old, was living with child's putative father, and was working at an unskilled job for low wages. She also had two other children: a daughter who lived with her and a son who lived with and apparently was supported by mother's aunt. Approximately three weeks after child's birth, mother and both children moved in with her mother (grandmother). Mother's family became very involved with child's daily care, with mother's 16-year-old sister and child's great-grandmother taking care of child when mother was at work or otherwise away from home.

Soon after birth, child developed medical complications—including asthma—that required medication as well as a heart and breathing monitor. Mother reduced her work hours to attend school. She began to fear losing her job because she was often disrupted at work to tend to child's medical needs. Because she had reduced her work hours, she lost her health insurance and had to pay for child's prescriptions and medical care out of her own pocket. Around that

same time, the putative father stopped assisting with child's care or support and filed a paternity action seeking to establish whether he was child's biological father. Mother was struggling to care for child and began to consider placing child for adoption.

On August 27, 1996, mother contacted Kaye McLeod, an Arkansas attorney who handles adoptions, and expressed an interest in placing child for adoption. A few days later, McLeod called mother to tell her that she had identified adoptive parents as a potential family for child. Mother continued to have periodic telephone contact with McLeod regarding the adoption process and met with her in person on November 22, 1996. McLeod provided information about adoptive parents and arranged for mother to have direct contact with them. After that, mother became acquainted with adoptive mother by telephone.

On December 4, 1996, mother went to McLeod's office and signed several documents, including a "Consent to Adoption" and a "Certificate of Irrevocability and Waiver." The consent form gave "full and free consent to the adoption" and relinquished "custody, guardianship and control of the child." The consent form also contained the following "waiver" language:

> "I hereby authorize any court having jurisdiction to make such an order as it deems fit regarding the adoption. I further waive all citation, legal notice and right to personal appearance in any court proceeding relative to the adoption or custody of my said child."

The certificate of irrevocability and waiver stated:

> "I agree that this Consent to Adoption shall become irrevocable as soon as the conditions required by law are met * * *.
>
> "I completely understand that by signing this document, when the above-stated conditions are met, I will forever afterward have no right to claim said child."

McLeod and mother gave conflicting accounts of the circumstances surrounding the signing of the consent forms.[1]

---

[1] As was true for the trial court, our legal resolution of the issues rests on facts that are not significantly controverted. Consequently, we identify only in general

According to mother, she did not understand that McLeod was going to ask her to sign the forms on that day, she felt rushed, and she was not told that she could obtain separate legal advice. Mother asserted, in fact, that she believed that McLeod was acting as her attorney. In contrast, McLeod maintained that, although she was not present when mother signed the documents, she did read the documents to mother afterward and advised her that she had a right to obtain her own attorney. McLeod also remembers that mother was in a hurry and was anxious to leave. Both McLeod and mother agree, however, that mother did not receive any independent legal advice and was not aware of the contents of the documents until after she had signed them.

According to McLeod, mother did not waver about the adoption at any time between their initial conversation and the transfer of custody. McLeod described mother as pragmatic and unemotional as well as persistent and anxious to complete the adoption. McLeod acknowledged, nevertheless, that she had significant doubts about whether mother in fact would complete the adoption. McLeod specializes in handling adoptions and understood the factors that create a risk of "disruption" by the biological mother. In assessing this adoption, she put it in a "high risk" category for several reasons: (1) child was older and had been in mother's custody and care for a significant length of time; (2) McLeod knew that mother expected her family to disapprove of her effort to release child for adoption; (3) McLeod was aware that mother once before had considered adoption for one of her children and then had changed her mind; and (4) the putative father refused to consent to the adoption until paternity was established and had expressed his intent to seek custody if he turned out to be child's father. Adoptive parents continued exploring other adoption opportunities during this time period.

The results of the paternity tests finally became available in mid-February. They established that the putative father, who was named on child's birth certificate, was not child's biological father. His consent was therefore no

terms where the parties' evidence differed and do not, because we need not, determine which account is more accurate or credible.

longer needed. McLeod continued making arrangements for the adoption. Because adoptive parents had not yet completed an updated home study, the transfer of custody was postponed until March.

On March 9, 1997, mother relinquished physical custody of child to adoptive parents. McLeod arranged for child to be transferred physically to adoptive parents on that date at a hotel in Little Rock. Adoptive mother traveled to Arkansas, was with McLeod at the hotel for the transfer, and then remained in Arkansas with child for two more days while McLeod obtained approval of the Oregon Interstate Compact on Placement of Children (ICPC) administrator. The Arkansas ICPC administrator had previously authorized child's placement in Oregon, designated that the adoption was to be completed in Oregon, and consented to having an Oregon agency supervise the adoption, make the placement investigation, and prepare the placement report. On March 11, 1997, as soon as the Oregon ICPC approval was received, adoptive mother returned to Oregon with child.

Meanwhile, mother had not revealed her plans to her family. Mother initially handled child's absence by leading her family to believe that child was staying with a friend for a few days. On March 13, two days after child arrived in Oregon, mother's family discovered that she had placed child for adoption. Mother's family was frantic and upset. Grandmother and mother's aunt personally called McLeod, demanding child's return. They also called adoptive parents, accused them of kidnaping child, and made other threats. Despite those telephone calls, adoptive parents decided to go ahead with the adoption, reasoning that "the child deserved a more stable family." Within days of those calls, adoptive parents had changed their telephone number.

Mother contends that she had by then unequivocally changed her mind and had expressed that to McLeod. McLeod contends that each time she talked directly and privately with mother, mother told McLeod that her family was not accepting her decision but that she still wanted to go forward with the adoption. Not disputed is the fact that mother, along with several members of her family, went to the police department on March 14 and accused adoptive parents and

McLeod of kidnaping child. Mother told the police that she had changed her mind and did not want to go through with the adoption. When the police contacted McLeod, she told them that the paperwork was in order, that mother in her last contact with McLeod still wanted to go through with the adoption, and that if mother had changed her mind, she needed to get a lawyer.

Grandmother then proceeded to retain a lawyer for mother. She did not know whom to call, so she contacted an Arkansas attorney, A. HaLarear Piper, after picking her name randomly out of the telephone book. Her first contact with Piper was on Friday, March 14, the day after the family learned of the adoption placement. Grandmother hired Piper on the following Monday, March 17, giving her $700 to represent mother in her attempt to revoke consent and contest the adoption. That same Monday, following the calls from mother's family, adoptive parents filed their adoption petition in Clackamas County Circuit Court. They did not serve mother with the petition.

The next day, March 18, Piper sent a letter by fax to McLeod. Piper advised McLeod that she represented mother in connection with the adoption and asked McLeod to direct all future correspondence and inquiries to her. McLeod considered her involvement in the adoption to have ended when adoptive parents received ICPC approval to pursue the adoption in Oregon. Therefore, McLeod decided that Piper's letter did not require a response. McLeod nevertheless wrote Piper approximately two weeks later, on April 3. She stated that she needed to provide Piper's client with some documentation and that, pursuant to Piper's March 18 letter, McLeod was furnishing it to Piper.[2] She sent a blind copy to Laurence Spiegel, the adoptive parents' attorney in Oregon. McLeod

---

[2] McLeod attached to the letter a two-page publication from the Oregon Department of Human Resources, entitled *Oregon Voluntary Adoption Registry: Questions and Answers*. That document is not in the record but appears to have been information relating to Oregon's program for post-adoption management of adoption records. In Oregon, birth parents, putative fathers, and adult adoptees may register their willingness to release identifying information to each other. ORS 109.430(1). That registry is managed and regulated by the State Office for Services to Children and Families (SOSCF). ORS 109.506. *See generally* ORS 109.425 to 109.507 and OAR 413-130-0300 through 413-130-0360.

did not furnish Piper with the name of mother's Oregon attorney and told mother nothing about the status of the adoption or that a petition had been filed.

Piper wrote McLeod again on April 8. She had the letter hand delivered to McLeod that day. In that second letter, Piper advised McLeod that mother was contesting the adoption. She asked for the caption, case number, and the location of the case so that appropriate documentation could be filed. McLeod provided a copy of Piper's April 8 letter to Spiegel by fax. The next day, McLeod sent Piper a letter, apparently by regular mail, acknowledging mother's intent to contest the adoption. She stated that she did not have the information Piper requested because her services in the adoption ended when the ICPC approval for placement was received (*i.e.*, March 11). She identified Spiegel as the Oregon attorney for adoptive parents and provided Piper with his address and telephone number. The letter noted at the bottom that she had sent a copy to Spiegel. Again, McLeod told Piper nothing about the status of the adoption.

Piper determined that mother should retain counsel in Oregon and identified an attorney for the family to contact. That attorney asked for a $4,000 retainer to take the case. Grandmother did not have that amount of money, but offered him $2,000 immediately, with $2,000 to follow. He refused, leaving mother without representation in Oregon at that point.

By then, the adoption proceeding in Oregon was underway. As part of the proceeding, Columbia Counseling, Inc. (CCI), an adoption services company, assessed the placement with adoptive parents and prepared a placement report. The director of CCI spoke with Piper on April 16. After Piper told him that mother planned to contest the adoption, the director telephoned adoptive mother and relayed that information. The director also included that information in his report, specifically explaining that "the biological mother plans to contest this adoption, stating she wants her baby back and that she did not receive proper legal counsel." CCI submitted the placement report to the trial court on April 21, 1997. The next day, April 22, the trial court issued the decree of adoption.

Unaware of the decree, Piper sent Spiegel a letter on April 23, telling him that she represented mother and asking him to direct all correspondence and inquiries to her. On April 27, Spiegel sent a letter to Piper explaining only that a "Decree of Adoption was entered in Oregon Circuit Court concerning the above child on April 22, 1997." He did not include a copy of the decree or tell Piper in which county it had been entered.

Back in Arkansas, the state bar eventually referred the family to legal aid services. An Arkansas legal aid attorney ultimately contacted Oregon Legal Services, which undertook mother's representation. Her Oregon attorney discovered the county in which the adoption decree had been entered and, on July 18, 1997, mother filed a revocation of consent and a motion to set aside the adoption with the circuit court in that county.

After a hearing, the trial court granted mother's motion to set aside the adoption decree. The trial court determined that ORS 109.381(2) did not preclude mother from raising the issue of the revocation of her consent and rejected mother's challenge to the court's subject matter jurisdiction. The trial court also concluded that the certificate of irrevocability and waiver was invalid because mother did not have independent legal counsel, as required by ORS 109.312-(2)(a)(F). Further, the trial court held that the notation in the placement report that mother had revoked her consent and intended to contest the adoption served to raise the issue of revocation of consent in the initial adoption proceeding. The trial court found an effective revocation of consent based on the revocation mother filed on July 18, 1997, and based on mother's testimony at the hearing. Finally, the trial court declined to find that mother was estopped from revoking her consent, concluding that her delay in appearing in the adoption proceeding was due to her lack of information about where the adoption proceeding was filed, together with her financial inability to obtain representation in Oregon.

On the basis of those findings and conclusions, the trial court entered an order setting aside the decree of adoption. The trial court also issued a writ of habeas corpus requiring transfer of child's custody to mother. Finally, the

trial court dismissed the petition for adoption. The trial court denied a stay pending appeal of its judgments and orders but granted a temporary stay pending appellate review of its denial. On adoptive parents' motion, this court stayed the trial court's order giving custody of child to mother pending this appeal.

## SUBJECT MATTER JURISDICTION

The threshold question on appeal is the issue raised by mother's cross-assignment of error—that is, whether Oregon has subject matter jurisdiction over this adoption proceeding. That question involves three sets of statutes: Oregon's adoption statutes, Oregon's version of the Uniform Child Custody Jurisdiction Act (UCCJA), and the federal Parental Kidnaping Prevention Act of 1980 (PKPA).

The Oregon statutes governing adoptions are codified at ORS chapter 109.304 *et seq*. ORS 109.309 sets forth two jurisdictional requirements for an adoption. First, at least one petitioner, the child, or one birth parent must be a resident of Oregon. ORS 109.309(1). Second, Oregon must have jurisdiction under the UCCJA. ORS 109.309(2). In this case, mother does not dispute that the residency requirement is met. The issue is only whether jurisdiction attaches under the UCCJA and, if so, whether federal law—specifically, the PKPA—nevertheless divests Oregon of jurisdiction under the circumstances of this case. To provide a context for our analysis of what the UCCJA and the PKPA require in an adoption setting, a brief description of the concerns that led to the enactment of those acts is helpful.

Before the adoption of the UCCJA and the PKPA, custody determinations could be made by courts in almost any state, even when the family's contact with a particular state was fleeting. *See Grubs v. Ross*, 291 Or 263, 267, 630 P2d 353 (1981). That fact led to forum shopping and related abuses. Parents warring over the custody of their children could, and often did, file simultaneous or successive actions in a jurisdiction of convenience or one that offered a possible tactical advantage. As a consequence, courts of different states often found themselves entering or at least facing conflicting decrees and inconsistent judgments. The rights of the parents similarly often were subject to inconsistent judicial

determinations. As a result, compliance with a decree in one state placed the parties in jeopardy of violating a decree in another state, which in turn exposed them to penalties and sanctions. *See id.*

Those problems prompted the Commissioners on Uniform State Laws in 1968 to draft the model UCCJA. The object of that model act was to resolve jurisdictional conflicts and to promote recognition and enforcement of sister state custody decrees. *See id.* at 268. All states have adopted some form of the model act. *See Henry and Keppel,* 326 Or 166, 169, 951 P2d 135 (1997). Oregon's version is codified at ORS 109.700 to 109.930. The stated purposes of Oregon's UCCJA, like those of other states, include avoiding jurisdictional competition and conflict, promoting interstate cooperation, litigating custody where the child and family have their closest connections, deterring abductions and unilateral removals of children, and promoting the exchange of information and mutual assistance between courts of sister states. ORS 109.720(1).

The UCCJA proved to be a less-than-perfect resolution to jurisdictional disputes in custody battles. States promulgated slightly different versions of the act, and courts continued to exercise their jurisdiction inconsistently, sometimes ignoring decrees entered in other states and creating inconsistent rights and obligations for parents. *See Henry,* 326 Or at 169. In 1980, Congress responded to the problem with preemptive federal legislation, the PKPA, 28 USC § 1738A (1994), which expressly declared its purpose " 'to provide for nationwide enforcement of custody orders made in accordance with the terms of the UCCJA.' " *See id.* at 169-70 (quoting *Thompson v. Thompson,* 484 US 174, 181, 108 S Ct 513, 98 L Ed 2d 512 (1988)).

In effect, the PKPA forces states to give full faith and credit to the custody decrees of sister states. To that end, the PKPA requires a state to "enforce" and "not modify" any sister state's child custody determination as long as it is "made consistently with the provisions" of the PKPA. 28 USC § 1738A(a). Two criteria must be met: (1) the court making the determination must have jurisdiction under the state's

own laws; and (2) the state entering the custody determination must satisfy one of five "conditions" specified in the PKPA. 28 USC § 1738A(c). The conditions require that the state exercising its jurisdiction: (1) qualify as the child's "home state"; (2) have a "significant connection" with the child; (3) exercise jurisdiction to address an emergency or abandonment of the child; (4) by default be the only jurisdiction that can or is willing to exercise jurisdiction; or (5) be "continuing" a prior exercise of jurisdiction.

The "conditions" that must be met under the PKPA are essentially the same as the bases for "jurisdiction" outlined in the UCCJA.[3] Under the UCCJA, Oregon may adjudicate a child custody determination if there is "home state" jurisdiction, "significant connection" jurisdiction, emergency or abandonment jurisdiction, or default jurisdiction. But the UCCJA and the PKPA differ in two notable ways. First, the bases for "jurisdiction" under the UCCJA are described in the PKPA as "conditions" of a foreign state's obligation to enforce another state's jurisdictionally proper decree. *Compare* ORS 109.730(1) *with* 28 USC § 1738A(c). Second, under the text of the UCCJA, where another state is a child's "home state," Oregon still can exercise jurisdiction on the basis of its "significant connection" to the child. ORS 109.730(1)(a) and (b).

---

[3] The UCCJA grants an Oregon court jurisdiction to make a child custody determination by initial or modification decree if:

"(a) [Oregon] is the *home state* of the child at the time of commencement of the proceeding, or had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of removal or retention by a person claiming custody or for other reasons, and a parent or person acting as parent continues to live in this state;

"(b) It is in the best interest of the child that a court of [Oregon] assume jurisdiction because the child and the parents of the child, or the child and at least one contestant, have a *significant connection* with [Oregon], and there is available in [Oregon] substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

"(c) The child is physically present in [Oregon] and the child has been *abandoned* or it is necessary in an *emergency* to protect the child * * *; or

"(d) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (a), (b) or (c) of this subsection, or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and it is in the best interest of the child that this court assume jurisdiction."

ORS 109.730(1) (emphasis added).

In contrast, the PKPA by its terms provides that a state's "significant connection" to a child renders its decree subject to full faith and credit only if no other state qualified as a home state when the proceeding was commenced. 28 USC § 1738A(c)(2)(B)(i). Thus, the PKPA, unlike the UCCJA, expressly prefers a child's "home state" connection over a child's "significant connection" with any other state.

■ We turn, then, to mother's challenges to Oregon's exercise of subject matter jurisdiction over this adoption. Although neither Oregon's UCCJA nor the PKPA specifically addresses adoption proceedings, adoptions fall within their provisions because those proceedings result in "custody determinations."[4] Here, child resided in Arkansas for more than six months prior to initiation of the adoption proceeding. Consequently, under both the UCCJA and the PKPA, Arkansas qualifies as child's home state. ORS 109.710(5); 28 USC § 1738A(b)(4).[5] Mother asserts that the PKPA's preference for home state jurisdiction operates to prohibit Oregon from exercising jurisdiction over child's custody.

■ Mother's argument, however, fundamentally misunderstands the PKPA. The PKPA does not purport to control state court jurisdiction. Rather, the PKPA is directed only to a matter of traditional federal concern—a state's obligation to give full faith and credit to another state's decree. As the

---

[4] In 1993, the Oregon Supreme Court so held with respect to Oregon's codification of the UCCJA. *State ex rel Torres v. Mason*, 315 Or 386, 392, 848 P2d 592 (1993). That same year, the Oregon Legislature amended the adoption statutes to explicitly incorporate the UCCJA's jurisdictional requirements, apparently legislatively endorsing the holding in *Torres. See* Or Laws 1993, ch 717, § 2 (codified at ORS 109.309 and enacted in lieu of *former* ORS 109.310). Although the legislature has not similarly incorporated the PKPA into the Oregon adoption statutes, that incorporation would not be Oregon's to achieve. The PKPA is a federal law and its scope and application are subject only to congressional control. But because it applies to all state "custody determinations," just as the UCCJA does, adoption proceedings similarly fall within its reach. *See generally Torres*, 315 Or at 389-92.

[5] Under ORS 109.710(5),

" 'Home state' means the state in which the child, immediately preceding the time involved, lived with the parents of the child, a parent, or a person acting as a parent, for at least six consecutive months, and, in the case of a child less than six months old, the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the six-month or other period."

The PKPA definition of "home state" is essentially identical. 28 USC § 1738A(b)(4).

Oregon Supreme Court held in *Henry*, the PKPA "preempts state law on the question of *modifying* another state's child custody decree." 326 Or at 172 (emphasis added). In other words, the PKPA controls only whether one state must enforce or may modify another state's custody decree. Noncompliance with the PKPA does not render a state's decree void or voidable for lack of jurisdiction; it means only that the decree is vulnerable to another state's exercise of jurisdiction.[6]

■ In this case, Oregon's compliance with the PKPA would be relevant if Oregon, rather than making an *initial* custody determination, were adjudicating the adoption after Arkansas already had done so. Alternatively, the PKPA would have bearing if an Arkansas court, after entry of Oregon's decree, sought to adjudicate who appropriately should have custody of child. The PKPA would determine whether, in those circumstances, either state's decree was vulnerable to the other's modification.[7] The PKPA does not,

---

[6] Our description of the PKPA comports with interpretations by several other jurisdictions, as well as scholarship on the subject. *See, e.g., J.D.S. v. Franks*, 182 Ariz 81, 893 P2d 732, 739 (1995) (state need not comply with PKPA to exercise initial jurisdiction); Greg Waller, *When the Rules Don't Fit the Game: Application of the Uniform Child Custody Jurisdiction Act and the Parental Kidnaping Prevention Act to Interstate Adoption Proceedings*, 33 Harv J on Legis 271, 281 (1996) (PKPA does not actually confer jurisdiction). *See also Thompson*, 484 US at 185-87 (PKPA requires states to give full faith and credit to other state orders; it does not, however, provide for federal court enforcement of state decrees because that would entangle federal courts in traditional state-law questions that they have little expertise to resolve). Although one intermediate California court appears to have read the PKPA more broadly to restrict a state from rendering a valid initial custody decree, the court's observations in that regard are *dicta*; the case did not actually involve an initial decree. *See Adoption of Zachariah K*, 6 Cal App 4th 1025, 8 Cal Rptr 2d 423, 429 (Cal App 2 Dist 1992) (concluding that the PKPA preempts state law on the issue of jurisdiction by a state to render a valid custody decree).

[7] The complications that are likely to arise when one state is free to modify another state's adoption decree provide a powerful incentive for states to structure their jurisdiction to achieve compliance with the PKPA. The notorious "Baby Jessica" case is a good example of the lengths parties will go to in an effort to avoid adverse rulings. There, the prospective adoptive parents (the DeBoers) resided in Michigan; the biological parents lived in Iowa. After the DeBoers petitioned for adoption in an Iowa court, the child's mother revoked consent and the putative father filed a petition to intervene and to establish paternity. The Iowa court ruled against the DeBoers. Immediately—indeed, on the same day—the DeBoers filed another petition for adoption, this time in a Michigan court. *See In re Clausen*, 442 Mich 648, 502 NW2d 649, 652-53 (1993) (outlining procedural history in Iowa courts). The Michigan court declined to exercise jurisdiction on the ground that Iowa was the child's home state and its exercise of jurisdiction satisfied the

however, determine whether Oregon's courts have jurisdiction to enter a custody decree. That issue is controlled only by Oregon law.

Whether the trial court had jurisdiction over this adoption proceeding depends, under ORS 109.309, on whether the UCCJA confers jurisdiction.[8] As earlier observed, Arkansas, not Oregon, qualifies as child's home state. Therefore, jurisdiction under the UCCJA depends on whether one of the other bases for jurisdiction fits these circumstances. Here, the other possible basis is "significant connection" jurisdiction. That requires a showing that:

> "It is in the best interest of the child that [Oregon] assume jurisdiction because the child and the parents of the child, or the child and at least one contestant, have a significant connection with [Oregon], and there is available in [Oregon] substantial evidence concerning the child's present or future care, protection, training, and personal relationships."

ORS 109.730(1)(b).

■ The statute contains two requirements. First, both the child and either child's parents or a contestant must have

---

conditions of the PKPA. *Id.* at 658. Had Iowa's decree not been subject to full faith and credit under the PKPA, the DeBoers' resort to another forum might have resulted in a decree favorable to them, leaving the parties subject to inconsistent decrees. *See* Waller, 33 Harv J on Legis at 272-73. In turn, if for any reason Michigan's exercise of jurisdiction had not been in compliance with the PKPA, then the biological parents would be free to seek yet another court determination of the child's custody. The resulting inconsistency and confusion for parties and courts alike serve no one's interests.

[8] New model uniform acts bearing on this question, if adopted by Oregon, would resolve state court jurisdiction pursuant to laws specially designed for adoption cases, not custody determinations more generally, an approach that has much to commend it. In late 1997, the Commissioners on Uniform State Laws finalized a replacement for the UCCJA called the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), 9 ULA Supp 242 (1998). The UCCJEA incorporates the home state preference of the PKPA and clarifies the rules for original, modification, and enforcement jurisdiction. UCCJEA § 201, 9 ULA Supp at 250. It also expressly excludes adoption cases from its coverage. UCCJEA § 103, 9 ULA Supp at 244. Those cases are intended to be dealt with by the 1994 Uniform Adoption Act (UAA), 9 ULA Supp 6 (1998), which sets forth separate jurisdictional provisions for adoption proceedings. *See* UCCJEA § 103 *comment*, 9 ULA Supp at 245. Most states are expected to adopt at least the jurisdictional provisions of the UAA. *Id.* The UAA allows a state to exercise jurisdiction in the *prospective adoptive parent's home state* if substantial evidence concerning the child's present or future care exists in that state. *See id.* at § 3-101(a)(2), 9 ULA Supp at 40.

significant connections with Oregon. If they do, then there must also be significant evidence available in this state concerning the child's present and future care. *See Torres,* 315 Or at 393 (describing two-part test for "significant connection" jurisdiction). As to the first prong, the signficance of the parties' connections to this state are tested as of the date that the adoption proceeding is commenced. *Id.* at 393 n 6. We therefore examine the significance of child's connections to Oregon based on the information available to the trial court when the adoption petition was filed.

■ From the petition and the documents that accompanied it, this appeared to be a fully voluntary and consensual placement of child for adoption. Mother had signed a formal consent statement, which included a waiver of appearance, as well as a certificate of irrevocability and waiver. Mother had placed child in the physical custody of adoptive parents, who are Oregon residents, in anticipation that they would formally adopt child in this state and that child would live with them here. Both states' ICPC administrators approved placement of child in Oregon and agreed that the adoption was to be completed in Oregon and that an Oregon agency would supervise the adoption, conduct the placement investigation, and prepare a placement report.[9]

Under those circumstances, Arkansas's connection with child was significantly weakened and, in turn, Oregon's connection was significantly strengthened. As of the filing of the petition, this was by all appearances a mutually agreed upon adoption and Oregon, as the state where the adoptive parents reside, was the mutually agreed upon forum for the adoption. The essential issue for the court's determination was the appropriateness of placing this child with these particular prospective adoptive parents, who had been longtime Oregon residents. In a voluntary private adoption of this

---

[9] Oregon, like Arkansas, has adopted the ICPC. *See* ORS 417.200 *et seq.* By regulation, SOSCF has interpreted the ICPC to apply to placement of out-of-state children in Oregon for independent adoptions. *See* OAR 413-040-0310. The parties do not address the relevance of Oregon's ICPC in this case, and we therefore offer no opinion on its application or significance here. Nonetheless, we do not ignore that both states' ICPC administrators approved child's placement in Oregon and agreed that the adoption should take place in Oregon, a fact we consider relevant to an assessment of child's connections to each state.

kind, it is difficult to see how an adoptive child's connection to Oregon under the circumstances could be anything less than significant.

■ Mother, nevertheless, urges that the fact that child had resided approximately eight and one-half months in Arkansas, and only six days in Oregon, renders child's connection to Oregon insufficient, apparently as a matter of law. To be sure, under ORS 109.730(2), "physical presence in this state of the child * * * is not alone sufficient to confer jurisdiction." But the point of that section is to preclude parties from establishing a "technical domicile" solely for purposes of invoking the benefits of a state's favorable adoption laws. *See* UCCJA § 3 *comment*, 9 ULA at 145 (1988).[10] In other words, someone who has established a physical presence in Oregon *only* so that he or she may seek the benefit of Oregon's adoption laws should not be considered to have a "significant connection" to Oregon.

Consistent with that approach, the Oregon Supreme Court has held that Oregon lacked significant connection jurisdiction when a child's short-term presence in Oregon was a product of exactly the type of evasive maneuvering that the UCCJA was designed to deter. In *Torres*, the child was born in Washington in 1986. In 1990, a Washington court awarded custody of the child to the mother, with reasonable visitation rights to the father. The mother consented to the adoption in July 1991, when the child was five years old. In August, the prospective adoptive parents took the child to Oregon to live with them and filed an adoption petition one

---

[10] As the Commissioners on Uniform State Laws commented in connection with that section in the model act:

"*Short-term presence in the state is not enough even though there may be an intent to stay longer, perhaps an intent to establish a technical 'domicile' for divorce or other purposes.*

"* * * [The] purpose [of significant connection jurisdiction] is to limit jurisdiction rather than to proliferate it. The first clause of the paragraph is important: jurisdiction exists only if it is in the *child's* interest, not merely the interest or convenience of the feuding parties, to determine custody in a particular state. *The interest of the child is served when the forum has optimum access to relevant evidence about the child and family.* There must be maximum rather than minimum contact with the state."

UCCJA § 3 comment, 9 ULA at 145 (first emphasis in original; second emphasis added).

month later. *Torres*, 315 Or at 388. The father challenged Oregon's jurisdiction to consider the petition. The court said:

> "The UCCJA does not say when a child's connection to a state becomes 'significant.' In *Grubs v. Ross*, [291 Or 263, 630 P2d 353 (1981)], this court discussed whether a child had a 'significant connection' to Oregon when that child had been abducted in Montana by his natural father and then resided in Oregon for 21 months. * * * [T]he court stated:
>
> > " 'Therefore, even in cases involving abduction of over six months in length, where the parent has been in the forum state for six months or longer, jurisdiction would exist under ORS 109.730(1)(a) unless barred by another section of the Act. As a corollary, in such cases jurisdiction would seem to exist, as well, under ORS 109.730(1)(b), for with the passage of time, the abducting parent and the child develop 'a significant connection' with the state * * *.' 291 Or at 270-71 (footnote omitted).
>
> > "In this case, child had lived his whole life in Washington, only to move to Oregon one month before the adoption proceeding was commenced. Under the facts of this case, one month is not a sufficient passage of time to develop a significant connection."

*Id.* at 393 (footnotes omitted). By quoting the "abduction" discussion in *Grubs*, we understand the court in *Torres* implicitly to have factored into its decision prudential grounds for declining jurisdiction—particularly, the disregard for the father's visitation rights, the existence of the Washington custody decree, and the fact that the child had lived in Washington for such a long period of time. Indeed, the court expressly limited its decision to the facts of the case, rather than hold that a short period of physical presence defeats UCCJA jurisdiction in all cases as a matter of law.[11]

---

[11] We acknowledge that a stronger suggestion to that effect appears in *Stubbs v. Weathersby*, 320 Or 620, 892 P2d 991 (1995). There, the court found home state jurisdiction under the UCCJA to exist as of the date that a supplemental adoption petition was filed alleging neglect and abandonment of the child. *Id.* at 627-28. By way of footnote, the court observed that it was "apparent" that there was no significant connection jurisdiction when the original adoption petition was filed, because the child had only been in the state for three months at that point and her only connection with Oregon was her "mere physical presence." *Id.* at n 4. That footnote was not a holding and we decline to elevate it to that status. The court's discussion does not purport to announce that, in all cases, an adoptive child's presence in the

■ We do not mean to parry the fact that child resided in Oregon for only six days before adoptive parents filed the petition for adoption. We agree that the short period of time that child had been present in the state is relevant and makes "significant connection" jurisdiction a close question here. However, to render that fact wholly determinative would mean that adoption proceedings could never be initiated upon an out-of-state child's arrival in this state to begin its life with an Oregon family. We find nothing in the statute's text or in the commentary of the model act to suggest that the UCCJA was intended to further such an inflexible policy. We therefore reject a test based solely on the amount of time the child resides in this state. If time is to have any bearing on our determination, it must be the quality, not the quantity, of the time that we measure.[12]

■ Accordingly, under these facts, we hold that the trial court had subject matter jurisdiction, despite the relatively short time that child had resided in the state when the adoption petition was filed. In following the policy of the UCCJA, courts cannot exercise jurisdiction based on a child's short-term physical presence in the state when that presence is a consequence only of an improper motive or an intent to establish a "technical domicile" in order to invoke Oregon's jurisdiction. Neither of those concerns is present here. To the contrary, this is a case in which adoptive parents had resided in Oregon for many years prior to the adoption. They intended to continue to reside here. The appropriate authority in Arkansas viewed Oregon as the appropriate venue to handle the adoption proceeding. Finally, mother—the only identified

state for fewer than three months renders the child's connection with Oregon insignificant *as a matter of law*. Such a holding would have far-reaching implications for voluntary private adoptions of out-of-state children—especially newborns and infants—the implications of which are not examined in the court's footnote.

[12] The conclusions we reach in an adoption context are not necessarily the same as those we would reach in an child custody dispute between two divorcing parents. UCCJA issues in dissolution cases often involve, for example, a child who lives with one parent in Oregon but frequently visits another parent in another state. Depending on the regularity of those visits, the other state may be able to exercise significant connection jurisdiction. *See, e.g., Koller and Koller*, 130 Or App 364, 368, 882 P2d 132 (1994) (California had continuing significant connection jurisdiction under the UCCJA, where children lived with mother in Oregon and regularly visited father in California). Thus, in a dissolution dispute, a child's single six-day visit to a state might not suffice. The significance of a child's connection to a state necessarily will vary with context.

biological parent—had by all appearances given her consent to the adoption. Notwithstanding the fact that child had resided in Oregon for a short period of time, we are satisfied that child had developed a significant connection to this state.[13] And there is no doubt that the second prong of the test—the availability of evidence pertaining to child's present and future care and personal relationships—is also satisfied. We therefore hold that Oregon has subject matter jurisdiction over this adoption.

## POST-ENTRY CHALLENGE TO THE DECREE

Having concluded that Oregon has subject matter jurisdiction over this adoption, the next issue is whether mother was entitled to challenge the validity of the decree. Adoptive parents rely on ORS 109.381(2), which provides:

> "Except for such right of appeal as may be provided by law, *decrees of adoption shall be binding and conclusive upon all parties to the proceeding*. No party nor anyone claiming by, through or under a party to an adoption proceeding, may for any reason, either by collateral or direct proceedings, question the validity of a decree of adoption entered by a court of competent jurisdiction of this or any other state."

(Emphasis added.) Adoptive parents assert that mother was a party to the adoption proceeding and therefore was barred by the statute from seeking to have the decree set aside after the time for appeal had run.

In support of their position, parents rely on *In re Flora's Adoption*, 152 Or 155, 159, 52 P2d 178 (1935), in which the Oregon Supreme Court identified four "interested parties" to an adoption proceeding: (1) the minor child; (2) the parents, or those standing in place of the parents; (3) the party seeking to adopt; and (4) the state. From the premise

---

[13] We note that even when significant connection jurisdiction exists, a trial court appropriately may decline jurisdiction on comity or prudential grounds. *See* ORS 109.760 (Oregon court shall refrain from exercising jurisdiction when custody proceeding is pending elsewhere and other state has exercised jurisdiction substantially in conformity with UCCJA); ORS 109.770 (Oregon court may refrain from exercising jurisdiction if another state's forum would be more appropriate or more convenient). Neither party's arguments or positions implicate those statutes, however.

that mother is an "interested party," adoptive parents argue that mother necessarily *was* a party to the adoption in this case for purposes of ORS 109.381(2). The argument, however, begs the issue. Merely because a person *should* be a party to a case does not mean he or she *is* a party to a case. Mother's status as a party turns on whether she had an opportunity to participate in the adoption proceeding, or waived that opportunity, such that she is bound by the decree.[14]

Mother, as child's biological parent, qualifies as an "indispensable" party to the adoption proceeding—that is, a person who must be a party to the case in order to issue an effective decree. *See generally Steers v. Rescue 3, Inc.*, 146 Or App 746, 749-50, 934 P2d 532 (1997) (if effective decree cannot be given without participation of a particular party, then the party is an "indispensable" one). Before a child can be adopted, the parents' rights, or the rights of a person or entity standing in the place of the parent, must first be terminated. *Stubbs v. Weathersby*, 320 Or 620, 631, 892 P2d 991 (1995). To protect the parents' interests, therefore, Oregon's statutes have long required that a parent receive notice and an opportunity to be heard in the adoption proceeding, unless the parent, in advance, effectively waives that right. *See generally Furgeson v. Jones*, 17 Or 204, 209-11, 20 P 842 (1888) (describing early Oregon statutory requirements). A parent's right to be heard in the adoption proceeding is fundamental:

> " 'It is a rule as old as the law, and never more to be respected than now, that no one shall be personally bound until he has had his day in court, by which is meant until he has been duly cited to appear, and has been afforded an opportunity to be heard.' "

*Id*. at 211 (quoting *Galpin v. Page*, 85 US 350 (18 Wall), 21 L Ed 959 (1873)). Indeed, a parent's right to be heard in an adoption proceeding is sufficiently basic to be constitutionally protected under the Due Process Clause. *Armstrong v. Manzo*, 380 US 545, 550, 85 S Ct 1187, 14 L Ed 2d 62 (1965);

---

[14] *Sant v. Open Adoption and Family Services, Inc.*, 153 Or App 114, 956 P2d 226 (1998), upon which adoptive parents rely, does not address how a necessary party must be brought into an adoption case to bind that party's interest. *Sant* stands only for the proposition that, in an agency adoption, the agency takes the parent's place in the proceeding. *Id*. at 120-21.

*Burrell ex ux v. Simpson*, 203 Or 472, 476, 280 P2d 368 (1955). Consequently, if a parent's right to notice and opportunity to appear is not safeguarded adequately, that parent may challenge a decree after its entry, not only within the one-year time period permitted by ORS 109.381(3), but potentially beyond it as well. *See Phariss v. Welshans*, 150 Or App 498, 503, 946 P2d 1160 (1997) (permitting biological father to challenge adoption decree several years after its entry).

 A principle basic to private adoptions is that, unless an adoption is based on some form of parental disability or neglect, consent of the child's parent or parents is a jurisdictional prerequisite to any adoption proceeding. *See* ORS 109.312; *Simons ex ux v. Smith*, 229 Or 277, 278, 366 P2d 875 (1961). Equally basic is the parent's right to withdraw the consent at any time before the decree is entered, a right that at one time was deemed absolute, but that later came to be qualified in limited circumstances by estoppel principles. *See generally Williams et ux. v. Capparelli*, 180 Or 41, 45-46, 175 P2d 153 (1946); *Dugger et ux v. Lauless*, 216 Or 188, 193, 338 P2d 660 (1959); *Small v. Andrews*, 20 Or App 6, 13-14, 530 P2d 540 (1975). Because parental rights are of such significance, and because adoptions are purely legislative in origin, the procedures for obtaining a parent's consent to the adoption must be strictly followed. *Stubbs*, 320 Or at 631-32.

 Oregon's statutes continue to reflect those principles. Under the UCCJA, before a child custody determination may be made by the court, "reasonable notice and opportunity to be heard" must be given to "any parent whose parental rights have not been previously terminated." ORS 109.740.[15] The UCCJA also provides, in turn, that notice to persons residing outside this state shall be given in "a manner reasonably calculated to give actual notice" and then lists specific methods that automatically satisfy that requirement. ORS 109.750. A

---

[15] The PKPA similarly requires notice to a parent whose parental rights will be terminated by a custody determination. 28 USC § 1738A(e). Although, as previously discussed, noncompliance with the PKPA does not divest an Oregon court of its authority or jurisdiction over a custody decree, it does expose that decree to later modification by another state.

parent's written consent to the adoption remains a jurisdictional prerequisite in cases other than those involving parental fault or neglect. *See* ORS 109.312(1). Moreover, and of special importance here, the adoption statutes now distinguish between consent and waiver of appearance, providing for a waiver of appearance only when the requirements for making consent irrevocable are met. ORS 109.312(2). Consequently, consent and waiver are not one and the same. Both must be accomplished on the terms set forth in the statute. *Compare Strobel v. Garrison*, 255 Or 16, 20-22, 459 P2d 1001 (1969), *reh'g den* 255 Or 16, 459 P2d 1001 (1970) (consent and waiver of appearance provisions in statutes pertaining to private adoption agencies must be followed for waiver to be effective).[16]

The means for obtaining irrevocable consent and a waiver of appearance involves several steps. A written certificate of irrevocability and waiver of appearance must be duly signed and attested. ORS 109.312(2). The parent must be "given an explanation by an attorney who represents the person and who does not also represent the adoptive family, by the State Office of Services for Children and Families or by an Oregon licensed adoption agency of the consequences of signing the certificate." ORS 109.312(2)(a)(F). The parent also must provide the adoptive parents with certain information about the child's social, medical, and genetic history and must transfer physical custody of the child to the person or persons to whom the consent is given. The prospective adoptive parents must file a petition to adopt in a court of competent jurisdiction, and the court must appoint the prospective adoptive parents or other suitable person to be the child's guardian. Finally, a home study report must be

---

[16] Providing for waiver of appearance only when a parent *irrevocably* consents to the adoption is a sensible way to ensure that the consent can otherwise be effectively withdrawn, as is the parent's right if it is not given irrevocably. Under earlier statutory schemes, a parent's mere consent to the adoption, without more, obviated the need to provide the parent with notice of the adoption proceeding. *See, e.g., Moody v. Voorhies*, 257 Or 105, 110, 475 P2d 579 (1970); *Furgeson*, 17 Or at 217-18. As already discussed, however, the parent retained the right to withdraw that consent. Once the adoption proceeding commenced, that withdrawal of consent had to be communicated to the court. Thus, deeming mere consent—that is, consent that may be revoked—to cut off a parent's right to notice of where and when an adoption proceeding is filed or pending frustrated the parents' very ability to revoke that consent. The current statutory scheme avoids that troubling anomaly.

prepared and submitted to the court by a proper entity approving placement of the child with the prospective adoptive parents. ORS 109.312(2)(a)(A)-(F). The certificate of irrevocability and waiver becomes effective only when all of those conditions are fulfilled. ORS 109.312(2)(b).

 Here, mother was never provided with even minimal notice sufficient to advise her of the pendency of the action and to afford her an opportunity to appear. Nor was there an effective execution of a waiver of appearance that would obviate any need to serve mother with notice. Adoptive parents concede that mother's consent was not made irrevocable by ORS 109.312(2) because, when she signed the certificate of irrevocability and waiver, she did not receive independent legal advice as the statute requires. ORS 109.312(2)(a)(F).[17] That infirmity not only infected the irrevocability of mother's consent, it also rendered mother's waiver of appearance invalid.[18] The trial court correctly concluded that mother may have been "nominally" a party in the sense that she was identified in the petition as having consented to the adoption and having signed a certificate of irrevocability and waiver. But she was not in fact a party in the sense that she had a meaningful opportunity to participate in the adoption proceeding. Because the waiver of mother's right to appear was not procedurally proper, mother was entitled to adequate notice and an opportunity to be heard. Having never received that notice

---

[17] Worth noting is that mother also signed an Adoption Disclosure Statement, as required by ORS 309.311. That form indicated incorrectly that McLeod was mother's attorney. Mother in fact testified in the hearing below that she believed McLeod represented her interests in the matter. McLeod testified that she made it clear to mother that she represented adoptive parents and that mother had a right to her own attorney. We need not resolve that dispute for present purposes. It is enough to observe that no one, including McLeod, gave the necessary explanation of consequences to mother.

[18] The waiver that mother was asked to sign was particularly broad, relinquishing her right to appear in "any court proceeding relative to [child's] adoption or custody." The Oregon Supreme Court has held, under the parallel statutory waiver provisions that apply to private adoption agencies, that to be effective, the waiver of appearance must identify *a specific proceeding* in which named adoptive parents are petitioners. *Strobel*, 255 Or at 21. Mother has not raised any issue about the adequacy of the substance of this waiver and we need not decide it. We note the potential concern, however, because of the significant interests at stake in these cases and the need for attorneys and agencies in Oregon using apparently standardized forms, as in this case, to ensure that those forms reflect all current statutory requirements.

48

or that opportunity, she was not bound by the decree and was entitled to challenge it after its entry. *See Phariss,* 150 Or App at 502-04.[19]

 There remains the question of whether mother effectively revoked her consent prior to entry of the decree. We have no difficulty concluding that she did. *Dugger* is directly on point. There, the Oregon Supreme Court noted that as a general proposition, once an adoption proceeding is pending, the biological parent cannot "effectively withdraw consent simply by an extrajudicial notification to the adoptive parents." *Dugger,* 216 Or at 193. It then held, however, that a placement report relating the mother's revocation of consent and made a part of the trial court file was adequate to call the court's attention to the problem:

> "Although the trial court was not required to accept as true everything that was stated in the report, *it had a clear warning that the respondent may have withdrawn her consent to the adoption, and this was notice of a very material fact because consent was essential to the court's jurisdiction over the matter.* We agree with the trial judge that under these circumstances the proceeding should not have continued until a citation had been issued to the respondent so that she would have an opportunity to express her objection to the adoption."

*Id.* at 194 (citation omitted; emphasis added).

The trial court correctly determined that the same conclusion follows here. As in *Dugger,* the home study report that CCI filed before entry of the decree provided the court with ample notice of mother's withdrawal of consent, thus

---

[19] Adoptive parents frame the issue, in part, as whether ORCP 71, which sets forth grounds for vacating a judgment, applies in adoption proceedings. Our decisions on that issue have not been consistent. *Compare Phariss* 150 Or App at 500 n 1 (noting that ORCP 71 B does not apply to adoption proceedings) *and Hallford v. Smith,* 120 Or App 57, 852 P2d 249, *rev den* 317 Or 485 (1993) (same), *with Wimber v. Timpe,* 109 Or App 139, 144-45, 818 P2d 954 (1991) (applying ORCP 71 to actions under ORS 109.381(3) because it does not supply a "different procedure" for objecting to an adoption decree). For present purposes, we need not resolve that inconsistency. We are satisfied that the trial court had authority to vacate the judgment irrespective of the applicability of ORCP 71. *See State ex rel Karr v. Shorey,* 281 Or 453, 466, 575 P2d 981 (1978) (court has inherent authority to vacate a judgment based on invalidity of consent and lack of notice and opportunity to appear in paternity proceeding).

requiring her to have an opportunity to participate in the adoption proceeding. Because she did not receive that opportunity, the trial court properly set aside the decree of adoption. The only remaining question for the trial court, therefore, was whether the petition for adoption should be dismissed, a determination that depended on mother's consent at the time of the hearing. Mother's affidavit in support of the motion to set aside the decree, as well as her testimony at the hearing, left no doubt that she had changed her mind and no longer consented to the adoption. The trial court's dismissal of the adoption petition therefore was proper as well.

■ Adoptive parents nevertheless contend that mother should be estopped from revoking her consent, thus leaving the decree of adoption in place. We question whether a parent ever should be estopped from revoking consent where there was an effort to make consent irrevocable pursuant to the statute, and that effort failed because the statutory requirements were not followed. *See Stubbs*, 320 Or at 634 (questioning whether estoppel applies where there is a failure to make consent irrevocable under ORS 109.312(2)).[20] Even if estoppel can extend to that circumstance, this is not a case in which it should.

■ Estoppel principles have been cautiously invoked in the context of a parent's power to withdraw consent to an adoption. That caution is warranted inasmuch as estoppel transforms a voluntary relinquishment of parental rights into an involuntary one, without necessarily providing the safeguards that would be accorded where parental rights are being terminated against a parent's will. *See generally Zockert v. Fanning*, 310 Or 514, 800 P2d 773 (1990) (in private adoptions based on nonconsensual grounds, parents must be accorded certain constitutional rights, including right to court-appointed counsel and elevated standard of proof). Reviewing the cases, we find none that supports estoppel in the circumstances here.

---

[20] Before *Stubbs* was decided, we held in *Aultman v. McCracken*, 104 Or App 266, 269, 799 P2d 1148 (1990), that a parent could still be estopped from withdrawing his or her consent, notwithstanding the procedures contained in ORS 109.312(2) for making consent irrevocable. *Stubbs* draws that conclusion into doubt.

As in *Small*, mother's consent in this case was given without the benefit of counsel. 20 Or App at 15. As in both *Small* and *H. and H. v. O. and W.*, 28 Or App 887, 890, 561 P2d 1038 (1977), mother's attempts to communicate her revocation of consent were timely, made only days after child's physical custody transferred from mother to adoptive parents. Also as in *Small*, to whatever extent mother's communication to the court was delayed, the delay was attributable to adoptive parents' resistance to mother's efforts to regain custody of her child. As in *Stubbs*, mother consented to adoption at a time of personal, financial, and emotional distress; in changing her mind, she communicated that change early on to adoptive parents and their attorneys and put the adoption court on notice of her withdrawal of consent. Finally, unlike *D.M.C. and G.T.C. v. C.B.J.*, 35 Or App 833, 583 P2d 22 (1978) and *Aultman v. McCracken*, 104 Or App 266, 799 P2d 1148 (1990), this is not a case in which mother can be said to have signed her consent with a full awareness or understanding of the consequences and significance of having done so. Indeed, we have found no case, nor do adoptive parents cite one, in which a parent has been "estopped" from revoking consent where there were doubts about whether the consent was made on the basis of a full and complete awareness of the nature of the rights the parent was relinquishing.

Those considerations, without more, would lead us to decline to apply estoppel here. But another circumstance present in this case eclipses all others: In revoking her consent when she did, mother did precisely what the documentation that she signed told her she could do. The terms of the certificate of irrevocability and waiver explicitly stated that mother's "consent to adoption" would become irrevocable *only* upon the completion of the various conditions outlined in the certificate. Put simply, mother was advised, specifically and by way of a signed and attested document, that she *could revoke* her consent until "all conditions required by law are met." The enumerated conditions included the filing of the petition for adoption, the court's award of guardianship to adoptive parents, and the filing with the court of a home study report approving adoptive parents as suitable.[21]

---

[21] Curiously, the one condition required by the statute not set forth on the form is the parent's right to be independently advised of the legal consequences of signing the form.

Mother revoked her consent before all of those events transpired. Indeed, she arguably revoked her consent before *any* of those events transpired. In doing so, mother did only what she expressly had been promised she could do. We decline to estop mother from withdrawing her consent where to do so would endorse giving a parent in these circumstances misleading advice or information.

██ ██ Adoptive parents' final argument is that mother should not be allowed to revoke consent because it is in child's best interest to remain in their custody. They argue that they are in a better position to raise child than mother, that child has bonded to them and to their adopted son, and that restoring custody to mother will emotionally harm child. But an analysis of the child's "best interests" alone is not a basis on which a biological parent may be estopped from revoking consent. *Small*, 20 Or App at 14. A voluntary adoption between private individuals should not be transformed into the occasion for a court to pick between competing home environments and to award custody to whoever might provide the child a more "acceptable" economic or emotional environment. *See id.* (discussing the limitations of the "best interests" rule as discussed in *Dugger*). Because mother validly withdrew her consent to the adoption and because she is not estopped from doing so, the adoption decree must be set aside.

██ ██ In reaching this conclusion, we are mindful that this will work a significant disruption to the bonds that have formed between child and adoptive parents and their son. But no one can doubt, on the facts of this case, that the disruption and emotional consequences of child's return to her biological mother would not have been occasioned had mother's significant parental interests been respected in the way the statutes—and perhaps constitutional principles, as well—require. As we observed in a case that bears several factual parallels to this one:

> "The hardships produced by a separation of the child and the [adoptive parents] at this time are in substantial measure the result of the [adoptive parents'] resistance to the natural mother's efforts to regain custody. Those hoping to become adoptive parents cannot create their best argument for keeping a child's custody by thwarting a natural parent's known wishes."

*Id.* at 15. This case stands as a reminder that the primary purpose of an adoption is to provide a home for a child, not a child for a home. *D.M.C.,* 35 Or App at 840. Adoptive parents' insistence that they can provide child with a better home does not justify the permanent and complete deprivation of mother's parental rights, particularly when the delay in returning child to mother is, at least in important part, due to their insistence to push the adoption forward despite early and frequent indications that mother had withdrawn her consent.

In sum, we conclude that the trial court correctly resolved the disputed issues in this case. Oregon properly exercised subject matter jurisdiction over the adoption proceeding. Because mother was not provided with independent legal advice on the consequences of signing the certificate of irrevocability and waiver of appearance, however, mother was entitled to participate in the hearing. Because she was not given notice and opportunity to be heard, the decree must be set aside. Moreover, because mother no longer consents to the adoption, and because she is not estopped from withdrawing her consent, the petition for adoption must be dismissed and child should be returned to mother's custody.

Affirmed.

**DE MUNIZ, P. J.,** concurring.

I agree with the majority that the trial correctly determined that the petition for adoption must be dismissed and that child must be returned to her mother. As the majority correctly notes, mother is a necessary party to the proceeding, and her consent is a jurisdictional prerequisite to the adoption. 160 Or App at 45. The majority is also correct that the certificate of irrevocability and waiver in this case did not meet the statutory prerequisites and thus was ineffective. *Id.* at 47. Mother revoked her consent to the adoption and, for the reasons stated in the majority, was not estopped from doing so. *Id.* at 50-51. However, none of those issues need be addressed in the present case, because the petition for adoption must be dismissed for a more basic reason.

As the majority explains, the critical first question under the relevant provision of the Uniform Child Custody

Jurisdiction Act (UCCJA) is whether the child has "a significant connection with the state" of Oregon. ORS 109.730(1)(b). Child was born on July 4, 1996, in Arkansas and lived in that state until March 11, 1997. Child was brought to Oregon on March 11, 1997, and the adoption petition was filed on March 17, 1997. A child's "significant connection" with a state is measured from the date that the adoption petition is filed. *State ex rel Torres v. Mason*, 315 Or 386, 848 P2d 592 (1993). Child's *only* connection with Oregon was that she was in the state for the six days before the adoption petition was filed. By comparison, the child was born in Arkansas, spent the first nine months of her life in Arkansas, and was the subject of a paternity proceeding in Arkansas. Moreover, during the six days in which the child was supposedly developing her "significant connection" with Oregon, her mother and her family in Arkansas were frantically trying to get her back, by contacting the Arkansas lawyer who facilitated the placement of the child with appellants, by hiring an Arkansas lawyer, and by reporting her kidnaping to the Arkansas police.

In *Torres*, a child was born in Washington, lived there for five years, and was the subject of a custody adjudication in that state. 315 Or at 388. The child's mother consented to the child's adoption, and the adoptive parents brought the child to Oregon one month before the adoption proceedings were commenced. *Id.* The court stated that, "[u]nder the facts of this case, one month is not a sufficient passage of time to develop a significant connection under ORS 109.730(1)(b)." *Id.* at 393. In *Stubbs v. Weathersby*, 320 Or 620, 622, 892 P2d 991 (1995), a child was born in Washington and lived the first eight months of her life there. The child was in Oregon with prospective adoptive parents for three months before an adoption petition was filed. The court stated that, when that petition was filed, "Oregon did not have jurisdiction under the UCCJA. As of that date, Child had resided in Oregon for only three months." *Id.* at 627 n 4. The court went on to state that, "[t]o establish 'significant connection' jurisdiction, '[t]here must be maximum rather than minimum contacts with the state.' Comment, UCCJA § 3, 9 ULA, part I, 144-45. *Physical presence of the child in this state is not alone sufficient to establish jurisdiction.* ORS 109.730(2)." *Id.* (Emphasis added.)

Nothing in the record of this case makes it distinguishable in any material way from *Torres* or *Stubbs*. Child was present in this state for only six days before the adoption petition was filed. If one month and three months in *Torres* and *Stubbs* respectively were not enough, certainly six days is not enough to establish a "significant connection" under virtually identical circumstances. Child did not have a "significant connection" with the State of Oregon at the time the adoption petition was filed. Under the UCCJA, the petition for adoption must be dismissed for lack of jurisdiction.