Argued and submitted September 9; resubmitted En Banc December 9, 1998, affirmed March 17, 1999

## Charles VEGAS
### and Margaret Vegas,
*Appellants,*

*v.*

## Lori BRUMFIELD
### and Joseph Vegas,
*Respondents.*

## (15-97-05809; CA A100354)

976 P2d 1155

William C. Atwood argued the cause for appellants. On the brief were Gary K. Jensen and Gary K. Jensen, P.C.

No appearance for respondents.

Before Deits, Chief Judge, Edmonds, De Muniz, Landau, Haselton, Armstrong, Wollheim, and Kistler, Judges, and Warren, Senior Judge.

DE MUNIZ, J.

Armstrong, J., dissenting.

## DE MUNIZ, J.

Paternal grandparents appeal from the trial court's denial of their petition for an order granting them the right to visit their granddaughter.

Under ORS 109.123(1),

"[t]he power of a court under ORS 109.121 and this section to grant visitation rights to grandparents is discretionary and shall be exercised only when the court determines that it would be in the best interests and welfare of the minor children involved."

On *de novo* review of the trial court's order, ORS 19.415(3), we affirm.

The record shows[1] that mother and father married in October 1991, and child was born in February 1992. The couple divorced in June 1993 but continued to live together until sometime in 1995. Their relationship was chaotic and abusive, and their dissolution judgment contains a restriction on father's visitation with child until he produces "certification of rehabilitation from drug abuse[.]" At one point, mother worked as an "exotic dancer," and, during at least one period, father was incarcerated. During a two-year period, mother, father and child lived in 12 different places, sometimes staying in shelters and, at times, staying with the paternal grandparents for brief periods, apparently for two or three weeks at a time.[2] Grandmother occasionally babysat child, and child played in grandfather's workshop. When the parents were not living with grandparents, they and child came to the home for family activities.

Grandparents' home was tumultuous. Grandfather acknowledged that, while both were living at his home,

---

[1] The child's mother, mother's adoptive mother, father's parents and father's sister testified. The trial court declined to interview child saying, "I don't think it would do that little girl any good at all to talk to me, in my black robe in a formal setting, so let's just minimize the damage here and leave her out of this."

[2] Grandfather testified that the contact

"varied because they lived somewhere, and then they would have rental problems, and they would come back and stay a few days. And then they would find another place, and it would just go back and forth, back and forth."

mother and his daughter had had a "scuffle" in the driveway of his house and that his "daughter got the short end of it." The last time mother stayed at grandparents' home, mother slept in a tent in the backyard because, grandmother testified, mother and father's fighting was driving her "crazy." Grandmother told mother that someone had to leave, and "Joe's my son. That leaves you." Mother left, returned to stay in the tent, and child went back and forth between the tent and house. Grandparents characterized their family as one of "hollerers," which grandmother attempted to explain was the result of having to speak loudly when their oldest son was going deaf: "[I]t did develop a bad habit of talking loud."

Grandfather acknowledged that father and mother argued and fought and "weren't any good for each other." Grandmother admitted that mother and father "continually quarreled." However, grandparents denied witnessing physical abuse between parents at their house. We find otherwise. Although the trial court did not enter specific findings of credibility, it based its denial of visitation, in part, on what child had experienced at her grandparents' home. Implicit in that conclusion is that mother's account of the abuse that occurred in grandparents' home was more credible. On our review, we agree. Mother testified that father was mentally and physically abusive to her, that he "beat [her] all the time that she was pregnant," and that he physically abused her in front of child and at grandparents' house.[3] She testified that, one time when father hit her, grandmother told her that she shouldn't say something to father to make him "do that." At one time, she was jailed after a physical altercation with father. Mother also testified that the "whole [Vegas] family situation" was "very abusive." The evidence shows that there was violence in the household and that grandparents were aware of it.

Mother now has no contact with father. After she left father, she cut off all communication with grandparents as well and would not let them see child. When asked why she did not want grandparents to visit child, mother stated:

---

[3] That the trial court accepted mother's version of the abuse directed toward her is implicit in its refusal to require her to give her current address on cross-examination.

"Well, I don't know what I would tell her if I said that they wanted to see her, that that's her dad's parents. Her dad doesn't want to have anything to do with her. He—she knows that he's been in and out of jail. She knows that she doesn't get any support from him. She knows all the abuse. She remembers them yelling. She remembers all the chaos in their family. She's going to remember that, and it's going to mess her up. She's not around that anymore."[4]

Mother is now employed in an office and testified that she "turned her life around" after going to Womenspace and getting counseling:

"Since I stopped having contact with [grandparents] and their son, my life has turned around. And I have been working. I support my daughter without any help from anybody, without child support that I've never gotten, without state help. I've worked really hard to be in this position. It was really abusive, and it's—I'm better now than I've ever been. And I don't plan on going back to that kind of a situation, or letting my daughter be a part of it.

"Right now, she is doing so good. She is in a kindergarten. Her life is stable, and it never was before. But the last two years she has a stable life, and she is so happy. And she's around the people that love her, and we're never going back to that kind of [abusive] lifestyle."[5]

The evidence does not show a corresponding change in father's life since the couple separated. Grandfather testified that he understood that his son had completed a drug rehabilitation program and could "pursue" visitation with child but that his son "chooses not to because of his lifestyle." Mother testified that she believed father still lives with his

---

[4] Mother also testified that, after she left, grandparents watched outside mother's apartment and followed her around Meier and Frank when mother was working there. Grandparents denied the claim but grandmother responded to the counsel's question as to whether grandparents had tried to approach mother:

*"After the time we followed her*, and she went to put a restraining order on us, no, we did not. * * * We went to a lawyer so we could [see our granddaughter] legally and above board." (Emphasis added.)

Mother did not appear at the hearing on the restraining order, and it was dismissed. She testified that she did not pursue it because she had moved from the apartment and did not think that she needed the order any more.

[5] The evidence shows that child's maternal grandparents presently help with child on weekends and provide financial assistance for medicine, food and clothes.

parents and that grandparents were seeking visitation only so that father could see child. Grandparents denied that, but grandfather acknowledged that father comes and goes at their house, although grandfather claimed that father sleeps in the barn, not the house, when he is at his parents' home.

In denying visitation, the court issued a letter opinion that stated, in its entirety:

"I have given the evidence presented in this case a lot of thought, and have come somewhat reluctantly to the conclusion that the Petition for Grandparent Visitation of the paternal grandparents should be denied.

"The bottom line here is what is in the best interest of the child. Given what she has been exposed to in the past in and around the grandparents' house through the actions of her father, her current apparent ongoing progress at putting that behind her, and that stability is understandably a very important component of her life at this time, it is better that the Petition be denied at this time. Grandparents are important, and I certainly hope that at some point in the future they can reenter her life, and I would encourage all concerned to work toward that at the appropriate time."

Grandparents first argue that the court erred in denying visitation based on the actions of father in his relationship to mother. They contend that the fact that mother and father had an acrimonious marriage and divorce should not be a reason to deny visitation to grandparents. The dissent agrees that the court erred in "focusing" on father's relationship to mother instead of on the relationship between child and her grandparents. However, both grandparents and the dissent ignore that the standard to apply in the determination of visitation is what is in the best interests of the child.

■ ■  Under ORS 109.121(1)(a), grandparent visitation may be ordered if the grandparent has established or has attempted to establish ongoing personal contact with the child, and the custodian of the child has denied the grandparent a reasonable opportunity of visitation. There is no question here that grandparents made the required showing: They had an ongoing relationship with child, and mother denied any opportunity to visit child. However, that showing,

by itself, does not mandate visitation. ORS 109.121(5) provides:

> "Any order creating visitation rights under this section shall be according to the court's best judgment of the facts of the case and shall include such conditions and limitations as it deems reasonable. *In making or modifying such an order, the court shall be guided by the best interests and welfare of the child.*" (Emphasis added.)

Moreover, as noted above, under ORS 109.123(1), the court's authority to grant visitation "shall be exercised only when the court determines that it would be in the best interests and welfare" of the child.

The court did not err here in considering what occurred between parents in grandparents' house in determining what was in child's best interests. Grandparents refuse to acknowledge child's exposure to the abusive environment or to address the importance of protecting child from any continuing consequences of that environment. Under the circumstances here, it is not possible to separate grandparents' relationship to child from the violence that occurred in their home, and grandparents' response to the abuse and to father's actions show that it would not be in child's best interests to order visitation.

Grandparents point to no circumstances that show that it would be in child's best interests to order visitation in light of the turbulence of child's early years at their home. They assume, as does the dissent, that maintaining a grandparent-grandchild relationship is always in the best interest of the child. Grandparents point to legislative history showing that the legislature viewed such relationships at beneficial. Clearly, ORS 109.121 is a recognition of the importance of that relationship. However, just as clearly, the statute recognizes that ordering that relationship is not always in the child's best interests. The purpose of ORS 109.121 is "to give the courts the authority to evaluate individual circumstances and, *in appropriate cases*, to ensure that grandchildren would not be denied a relationship with their grandparents." *Pointer and Pointer*, 112 Or App 511, 515, 829 P2d 1016, *rev den* 313 Or 627 (1992) (emphasis added). This is not such an appropriate case. Unlike in *Pointer*, where experts for both

parties testified that relationship with grandparents was beneficial to the child, this record shows the continued presence of father in grandparent's home and gives no basis on which to believe that grandparents would assert themselves to intervene in father's conduct.

■ Grandparents next argue, however, that the court erred in not ordering visitation because they were agreeable to limited visitation with conditions so that father would not see child. The dissent again agrees, apparently believing that the court should fashion a visitation order to prevent unauthorized contact with father. ORS 109.121(5) authorizes conditions and limitations on visitation. Here, however, Mother's stated concern that visitation may lead to visits with father is justified. Grandparents continue to support and sympathize with father, who had stayed with them as recently as a month before the hearing. Grandparents' past relationship with mother has been acrimonious. Grandparents ask for visitation one weekend a month,[6] but they offer no plan or suggestion for the court's consideration as to how they will ensure that father would not see child while at grandparents' home, which he visits as he chooses.[7] Moreover, adverse effects of child's visitation in grandparents' home go beyond the possibility of visitation with father; they encompass grandparent's inability to see the tumultuous atmosphere of their home. Grandparents' willingness to accept limited visitation does not alter the instability to child of visitation in that environment.

The trial court's letter shows that it found that child was progressing in putting behind her what she had experienced at grandparents' house and that threatening child's present stability was not in child's best interest. Having so concluded, the court denied grandparents' petition for visitation. The trial court did not err in denying grandparents' petition.

Affirmed.

---

[6] They also sought the right to make telephone contact every two weeks.

[7] The dissent suggests that visitation could be ordered in a "stable environment" without identifying where that might be. Surely the dissent does not intend that environment to be mother's home in light of grandparent's animosity to mother and the need to keep father from learning where mother lives.

**ARMSTRONG, J.,** dissenting.

Because I believe that limited grandparent visitation that is structured so that the child has no unauthorized contact with her father would be in the child's best interests, I dissent.

The record indicates that mother's purpose in denying visitation was not to prevent the child from being abused by grandparents but, rather, was to prevent the use of that visitation to permit father to have unauthorized contact with his daughter. The court's order reflects that concern as well, focusing as it does on the father's actions in the grandparent's home.

It is, indeed, unclear where father currently resides. It is quite possible that he is living at his parents' home. Mother was justly concerned that visitation at grandparents' home might lead to unauthorized and inappropriate contact with father. Father's presence and actions are not the issue, however. The issue before the court was whether the best interest of the child would be served by denying her all contact with her grandparents. I conclude that it would not be. Although there is evidence to support the conclusion that grandparents may have contributed to some of the marital strife between mother and father, and that grandparents' household was not the most peaceful of environments, there is also evidence that grandparents love and miss their granddaughter.

Moreover, grandparents sought only limited visitation and indicated that they were amenable to further limitations. The trial court failed to consider adequately grandparents' willingness to abide by appropriate limitations. We considered the effect of such limitations in a similar case involving a stepparent's bid for visitation rights and concluded that the court's decision whether to grant the petition should take into consideration "the nature and extent of visitation sought[.]" *Shofner and Shofner,* 137 Or App 534, 552, 902 P2d 268 (1995), *rev den* 322 Or 644 (1996). In this case, the trial court's letter opinion does not appear to take into consideration the very limited contact that grandparents are seeking. It is well within the power of the trial court to fashion a visitation order that would ensure that the child

remains in a stable environment and has no unauthorized contact with her father.[1]

The practical effect of the majority's decision is that grandparents will not have a relationship with their grand-daughter unless mother decides to permit it, and nothing suggests that mother will do that. I do not believe that the record supports a conclusion that the limited contact that grandparents seek would be harmful to the child. Hence, I do not believe that it is in her best interest to deny her any relationship with her grandparents. Accordingly, I would reverse the judgment of the trial court and remand with instructions to fashion an appropriate visitation order that allows the child to become reacquainted with her grandparents and to develop a relationship with them but that takes into account the child's need for a stable, nonabusive environment by imposing strict limits to prevent unauthorized contact between the child and her father.

Edmonds, J., joins in this dissent.

---

[1] The majority questions where such a stable environment could be, given the threat that it perceives that grandparents and father represent to mother's safety. Although the record does not offer any examples, it is possible that the parties could agree on a neutral location for visitation to occur. We need not determine that location at this point, however. Rather, that is something for the trial court to consider on remand.