Argued and submitted February 28, judgment ordering visitation reversed
October 18, 2000

## In the Matter of the Marriage of

Billy SISSON,
*Petitioner,*

*and*

Victoria SISSON,
*Respondent.*

Edith E. GATLIFF
and Bill Sisson,
*Respondents,*

*and*

Billy SISSON,
*Respondent,*

*v.*

Victoria SISSON,
*Appellant.*

(960801; CA A102854)

13 P3d 152

Lorena Reynolds argued the cause for appellant. With her on the brief was Oregon Legal Services Corp. Albany Regional Office.

James Susee argued the cause for respondents Edith E. Gatliff and Bill Sisson. With him on the brief was Allen, Stortz, Fox, Sussee & Olson.

No appearance for respondent Billy Sisson.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

Mother appeals from the trial court's judgment granting paternal grandparents' (grandparents) petition for visitation with their grandson (child). She assigns error to the trial court's findings that she unreasonably denied visitation and that visitation is in child's best interests. We review *de novo*, ORS 19.415(3), and reverse.

Mother and father married in December 1993. Mother gave birth to child in April 1994. Mother and father initially lived together with child, and then mother and child lived with grandparents while father was incarcerated for an assault of a previous girlfriend. Grandparents provided child care, transportation, food and money to both mother and child during that time. At some point, mother separated from father after father was released, and she moved from grandparents' residence.

In May 1996, father petitioned for the dissolution of the marriage. Mother was awarded custody of child, and father exercised regular visitation for a seven-month period, while the dissolution was pending. At the time, father was living with grandfather, and grandparents saw the child regularly. Unfortunately, disputes arose about visitation arrangements, and on November 6, 1996, father violently assaulted mother outside her residence. He held both mother and child at gunpoint for several hours, threatening mother's life and claiming that grandparents would take care of child once he killed mother, or had her killed by a third party. During much of the duration of the assault, child was in a car seat in the back of mother's vehicle. Child may have seen father put a rifle into mother's mouth, and he saw mother bleeding from the wounds that father inflicted. Child vomited on himself during the incident, and was not fed or changed throughout the three-hour attack, because father forced mother to drive the car around while he threatened her physically and verbally. After the incident, father fled and evaded arrest for several months.

Immediately after the assault, grandfather stopped by mother's residence, where he had very rarely visited in the past. In the conversation that ensued, grandfather indirectly

blamed mother for the assault committed by father and was upset with mother that child had not been changed or fed during the day of the attack. Soon after the attack, grandmother allegedly told a police officer that mother deserved what happened to her. Grandparents and other family members were involved in the achieving of father's eventual arrest by providing information to the police about calls that they received from him.

Since the assault, child has been in mother's sole custody and has had no contact with grandparents. Because of the threats made against mother's safety by father, mother has assumed a new name and identity, and she testified in the proceedings below by telephone. Also, mother has remarried. Father is scheduled to be incarcerated until 2006, but he has petitioned the trial court separately for parenting time with child.

Grandparents petitioned the trial court pursuant to ORS 109.121 for an order allowing visitation between themselves and child, who is now six years old. At the hearing on the petition, mother argued that no visitation could be effectuated safely and without jeopardizing her efforts to relocate and protect herself from father. The trial court found that

"the grandparents had developed a significant relationship with their grandson, particularly during the first year of his life. * * * [G]randparents have not been allowed any contact with their grandson since at least November, 1996. [I]t is in the best interests of [child] and his grandparents that visitation be allowed."

It ordered extensive, unsupervised visitation by grandparents. They were awarded the right to visit with child one weekend every other month, two weeks during the first summer and four weeks during the following summer. The court also ordered four days of visitation during each Christmas holiday. Once child begins school, the visitation order awards grandparents four three-day weekends, four weeks in the summer, four days over Christmas and one half of the spring vacation. The order also requires mother to give grandparents her phone number and to take child to a location halfway between mother's residence and grandparent's residence

for each visit. Grandparents are ordered not to allow any contact between child and father and to use their best efforts not to allow father to learn the location of mother and child.

On appeal, mother contends that the trial court exercised its authority erroneously under ORS 109.121 when it granted visitation to grandparents.[1] She argues that they have not been denied reasonable opportunities to visit with child within the meaning of the statute, because there is no safe way for visitation to occur. Alternately, she argues that although grandparents may have had a meaningful relationship in the past with child, it would not be in the child's current or future best interests to have visitation occur at this time. She contends that child associates grandparents with the trauma of father's assault and kidnaping of her and that he would therefore be traumatized by future contact with them, that grandparents have enabled father's abusive tendencies in the past, and that disclosing her new location and identity to them would jeopardize mother's physical safety and child's emotional well being.

ORS 109.121 provides, in part:

"(1)(a)   A child's grandparent may, upon petition to the circuit court, be granted an order establishing reasonable rights of visitation between the grandparent and the child if:

"(A)   the grandparent has established or has attempted to establish ongoing personal contact with the child; and

"(B)   the custodian of the child has denied the grandparent reasonable opportunity to visit the child.

"* * * * *

"(5)   Any order creating visitation rights under this section shall be according to the court's best judgment of the

---

[1] After this case was briefed, the United States Supreme Court decided *Troxel v. Granville*, 120 S Ct 2054, 147 L Ed 2d 49 (2000). The court in *Troxel* held a Washington grandparent visitation statute unconstitutional, because it did not require the consideration of the parent's own determination of the child's best interests. This court follows the principle that we do not reach constitutional issues when there is an adequate statutory basis for a decision. *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 687 P2d 785 (1984). Because we decide this case on a nonconstitutional basis, we do not reach the constitutionality of ORS 109.121(1).

facts of the case and shall include such conditions and limitations as it deems reasonable. In making or modifying such an order, the court shall be guided by the best interests and welfare of the child."

We refrain from making a determination of whether mother's denial of visitation between grandparents and child was unreasonable, because the evidence persuades us that mother's second contention is dispositive—that grandparent visitation is not in child's current best interests. To be granted visitation with a grandchild under ORS 109.121(1), a grandparent must show that the child would be benefitted by the visitation. Showing that the child would not be harmed by visitation is insufficient. It is also insufficient to rely on an argument that, in general, children are always benefitted by contact with their grandparents. *Vegas v. Brumfield*, 159 Or App 134, 141, 976 P2d 1155 (1999). Thus, the statute requires a specific showing in each case that the particular child involved would benefit in some way from the ordered visitation. *Id.*

Grandparents offered evidence that they had been caregivers during child's first two years, that they had provided food, shelter and transportation to mother and child, that they were involved in child's life regularly and that they had a close relationship with child as the result of their contacts. Grandparents testified that, if allowed visitation, they would take steps to protect child from harmful exposure to pictures of his father and that they would restrict father's access to child and protect child's new identity. They presented evidence that child would be loved and treated well during visits, if visits were allowed. Overall, their evidence shows that they once had a loving, stable relationship with child that has been disrupted and that they would not undermine child's physical or emotional security, if they were allowed to have contact again. We assume, without deciding, that their statements are credible in that regard.

Nonetheless, the particular facts presented by this record persuade us that child would not be benefitted by visitation with grandparents, despite their past relationship and benevolent intentions. Mother presented evidence that even a well-intentioned, carefully structured contact between

grandparents and child could result in trauma for child. In child's mind, grandparents and their residence are closely tied to child's former observations of violence and abuse so that he will suffer emotional trauma if contact occurs. Presently, child has fearful and intense reactions to events like the sight and smell of blood, incidents of violence against women on television and to people who resemble his father. Those reactions include nightmares, hysterical crying, screaming and talking incessantly about the assault on his mother. Mother's new husband testified that:

> "[a]nything with violence, especially if it's violence toward a woman[,] just totally freaks him out[.] He comes unglued, he starts crying, he starts alluding to the incident that happened. Any time he sees any blood, whether it's on himself, whether it's on his mom, whether it's on me, it just, it totally freaks him out, he starts talking about the incident, it takes us a long time to calm him down. He has nightmares at night where he'll wake up screaming and he'll either ask for his mom or ask for me, we go in, you know, 'What's wrong,' he says, 'Don't let that man get me.'"

He also testified that when child once saw a brief excerpt from the television show, "Unsolved Mysteries,"

> "[h]e immediately, he says, he grabbed me, turned around and grabbed me, he wouldn't look, he says, Don't let that man get us and he started talking about mommy getting hurt, blood and pointing to his nose."

Finally, he testified, that child "can remember details as to what happened * * * that absolutely floor me."

Mother's expert witness, a child development specialist, testified that child is "already compromised in his ability to deal with everyday stressors." Matters as innocuous as a strong resemblance between grandfather and father, according to the witness, could trigger further reactions by child and cause additional psychological damage. The testimony demonstrates that child has a remarkable memory of the events of November 6, 1996. The expert witness believes that a return to the grandparents' hometown where the assault occurred, or even seeing a car like one he saw on the day of the assault might be enough to trigger similar reactions. She concluded:

"Q.  Is it possible that contact between the grandparents and the child could cause the child further trauma?

"A.  I think that given the nature of the trauma that the child has suffered—[this] child in particular but generalized to any child that would have suffered that—[visitation] would possibly trigger events again that would cause trauma to the child.

"* * * * *

"Q.  Okay. So just effectuating visitation would be traumatic?

"A.  I think so at this point. Again, it's an unknown, but I would guess that."

Although the expert witness relied on reports about child from mother and child's therapist rather than talking to him directly, there is compelling evidence in the record about child's current condition that supports her projections. Mother's new husband testified that he has been present in a counseling session with mother, child, and child's therapist, and that when the topic of grandparents was brought up, child "immediately ran to his mother and, you know, he always goes back, he'll either start talking about the incident or he'll say, 'Don't let that man get me, don't let that man get me.' " In addition, mother's expert witness testified that child will likely have flashbacks, nightmares, sleeping difficulties and negative guilty feelings in the future. She stated that child's reactions later in life may be even worse than those of children exposed to war or natural disasters, because the trauma occurred within child's family, which was his central support system. According to her, manifestations of the trauma are likely to recur at times of change in child's life, such as when he enters school, begins adolescence, and gets married.

■  In *Cohen and Cohen*, 89 Or App 12, 747 P2d 363 (1987), *rev den* 305 Or 331 (1998), a dissolution case, we held that father's visitation rights should be suspended because of the adverse emotional and psychological effect on the child from continuing visitation, even where there were few indications that the child's fears were justified. In determining whether visitation by a noncustodial parent is appropriate, we said that our paramount concern was the best interests of the child. *Id.* at 15. The same concern exists in the context of

grandparent visitation. We hold that visitation without regard to the character of the petitioners may be denied under ORS 109.121 if visitation could adversely affect the child. Here, while grandparents are not responsible for their son's actions in assaulting mother, their ability to interact with their grandson is clearly affected by their son's actions and the resulting trauma.

The record also reflects that grandparents have a history of domestic violence. While they are no longer married to each other, their comments about their own history show a lack of understanding of the effects of violence on family relationships. Grandfather abused grandmother throughout their marriage. Some of the violence occurred in the presence of their children. Grandfather once kidnaped grandmother and their children, including father, took them out-of-state, and held them there against their will. When grandfather was asked, "Did you ever hit [grandmother]?," he replied, "Oh, we've had our battles at one time when we was younger." When asked, "Were the children ever present during these?" he responded, "I don't think so. I mean I don't think I hit her that hard."

As to grandmother, there are indications that she also does not appreciate the seriousness of the trauma caused by domestic assault. Mother testified that when father was prosecuted for an earlier assault against a former girlfriend, grandmother "did not feel that what he had done to [the former girlfriend] was inappropriate," and she "minimized the extent of the violence that was inflicted on this woman." There is evidence that grandmother, when questioned about father's attack on mother, "expressed a great deal of anger towards [mother] and basically stated that a large cause for [father's] actions was [mother.]" Although grandparents have expressed the willingness to undergo counseling and training about the effects of domestic violence that could make them more prepared in the future for contact with child, their willingness does not overcome the present need to protect child emotionally.[2]

---

[2] Mother, on the advice of a counselor, has taken precautions to protect child's emotional and psychological health by removing all reminders of the traumatic assault witnessed by child. Mother's expert testified that any visitation in the future should occur only after child is psychologically ready for contact with grandparents. It is our perception from the record that future visitation that is healthy

After our review of the record in this case, we are persuaded that child's best interests are served by him not having contact with grandparents at this time. Accordingly, grandparent's petition for visitation under ORS 109.121(1) is denied because they have not met all of the statutory criteria.

Judgment ordering visitation reversed.

---

for child can only occur if mother, child and grandparents are engaged in an ongoing therapeutic program that is designed to meet the needs of child and facilitate contact.