Argued and submitted July 6, 2000, order of visitation under ORS 109.121
reversed; otherwise affirmed February 28, 2001

Maria RING,
*Respondent,*

*v.*

Erik D. JENSEN,
*Appellant.*

(96-3408, P96-6642, 97A-1125; CA A105865)

20 P3d 205

Michael L. Doss argued the cause for appellant. With him on the brief was Gevurtz, Menashe, Larson & Howe, P.C.

Liza Langford argued the cause and filed the brief for respondent.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

Father (Erik Jensen) appeals from the trial court's judgment granting maternal grandmother's (Maria Ring) petition for visitation with father's daughter (child), ORS 109.121, and denying stepmother's petition to adopt child, ORS 109.309; ORS 109.350.[1] Our review of the facts is *de novo*. ORS 19.415(3). We reverse in part.

Father and child's mother (Lynne Ring) were involved in a relationship in 1990. They lived together immediately before child's birth and for approximately one year after her birth. Child and mother then lived with maternal grandmother and her domestic partner for one year, before father and mother ended their relationship. Thereafter, father and mother continued to share parenting responsibilities for child, who spent alternating weeks with each parent. During the time that child was in mother's care, grandmother provided care during the day. During the time that child was in father's care, child was cared for at times by a babysitter and at times by stepmother, to whom father was not married at the time. Mother was murdered in 1994, when child was four years old. Child began to live exclusively with father at that time and has remained in his care. Father and stepmother have married and have shared responsibility for parenting child and stepmother's three children, who also live with them.

After mother's death, grandmother initiated visits with child by calling father's home and requesting visitation time from father or stepmother. In 1996, grandmother perceived that father was becoming reluctant to allow visitation between her and child. She filed a petition with the court for an order of visitation pursuant to ORS 109.121, and for the appointment of a conservator over child's financial affairs in October 1996. While those matters were pending, father and stepmother (Martha Jensen) filed a petition for the adoption

---

[1] The judgment also denied grandmother's request for a change of custody from father to herself and her request to have herself appointed conservator over money that child receives periodically. Those portions of the judgment are not before us on appeal.

of child by stepmother. Grandmother moved to modify custody from father to herself in July 1998. The trial court commenced the hearing on the visitation petition on March 13, 1998. Hearings were also conducted on April 1, October 1 and 9, and December 3, 1998.

The trial court denied the petition for adoption, ruling that ORS 109.350 required a finding that the adoption be "fit and proper." In light of expert testimony about child's emotional unreadiness to be adopted as the result of her mother's death, the court concluded that the adoption was not in child's best interests. The court also ruled that father had denied grandmother reasonable opportunities to visit and that visitation was appropriate and in child's best interest. It awarded grandmother the right to visitation every other weekend, during spring vacation every other year, during one-half of each Christmas school vacation, for four weeks each summer, on the day of child's mother's death each year, on grandmother's birthday each year and on Mother's Day and Thanksgiving every other year.

First, we address father's fourth assignment of error. In that assignment, father contends that the trial court should have granted stepmother's adoption petition, arguing that there is no statutory authority for a court to refuse to grant an uncontested step-parent adoption. The Supreme Court has identified four categories of "interested parties" to an adoption proceeding: (1) the child who is the subject of the petition, (2) the biological parents or those standing in their place, (3) the party or parties seeking to adopt, and (4) the state. *In re Flora's Adoption,* 152 Or 155, 159, 52 P2d 178 (1935). A person who has an interest that would be affected by the outcome of an appeal must be a party to the proceeding, or a court is without the power to issue an effective judgment. *See generally McCulley v. Bone,* 160 Or App 24, 43-44, 979 P2d 779, *rev dismissed* 329 Or 523 (1999); *Steers v. Rescue 3, Inc.,* 146 Or App 746, 749-50, 934 P2d 532 (1997) (if an effective judgment cannot be given without the participation of a particular party, then the party is "indispensible"). Stepmother is not a party to the notice of appeal,[2] and this

---

[2] The petition for visitation and the petition for adoption were consolidated by the trial court, but the trial court did not change the caption of the case prior to

court cannot grant father's requested relief—reversal of the denial of stepmother's adoption petition and a grant of her adoption petition—without her participation. Therefore, we do not reach father's fourth assignment of error.

■ Father's first and second assignments of error are that the court erred in granting grandmother's petition for visitation under ORS 109.121,[3] or that, alternatively, if the court properly exercised its authority under the statutes, the amount of visitation ordered was excessive. ORS 109.121 provides, in part:

"(1)(a) A child's grandparent may, upon petition to the circuit court, be granted an order establishing reasonable rights of visitation between the grandparent and the child if:

"(A) The grandparent has established or has attempted to establish ongoing personal contact with the child; and

"(B) The custodian of the child has denied the grandparent reasonable opportunity to visit the child.

"* * * * *

"(5) Any order creating visitation rights under this section shall be according to the court's best judgment of the facts of the case and shall include such conditions and limitations as it deems reasonable. In making or modifying such an order, the court shall be guided by the best interests and welfare of the child."

Father concedes that grandmother met the requirement of ORS 109.121(1)(a)(A) because grandmother has a long-term, caring relationship with child. He argues, however, that grandmother failed to establish the other threshold qualification under ORS 109.121(1)(a)(B), because she

---

entry of judgment. The caption on appeal, taken from the judgment, therefore also does not reflect stepmother's participation in the case.

[3] None of the parties to this action challenged the constitutionality of ORS 109.121 in the trial court, and consequently, we do not specifically address that issue. After this case was submitted, the United States Supreme Court issued its decision in *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000). The court held that Washington's grandparent visitation statute was unconstitutional because it did not require a trial court to give any weight to a parent's own determination of a child's best interests.

did not demonstrate that he denied reasonable opportunities to visit the child. The decision on grandmother's petition turns on the resolution of that issue.[4]

 The requirement in ORS 109.121(1)(a)(B) that a grandparent establish that the custodian has denied him or her a reasonable opportunity to visit with the subject child seeks to strike a balance between a custodial parent's right to make decisions about what visitation is in a child's best interests and visitation by the grandparent. It is only when the custodial parent's decisions are unreasonable that the scale is tipped in favor of the grandparent and the law will intercede by declaring visitation rights. Otherwise, courts are not authorized to order grandparent visitation under the statute. The striking of such a balance is reflected by two of our prior decisions. In *Pointer and Pointer*, 112 Or App 511, 829 P2d 1016, *rev den* 313 Or 627 (1992), we considered the mother's argument that the trial court erred in awarding grandparent visitation under ORS 109.121 and alternatively, if visitation was appropriate, that the amount ordered was excessive. The mother argued that the statute applied only to circumstances where there was a complete denial of access to a grandchild and that the grandparents in that case could have visitation during father's parenting time. We said that "[t]he purpose of the statute was to give the courts the authority to evaluate individual circumstances and, in appropriate cases, to ensure that grandchildren not be deprived of a relationship with their grandparents." *Id*. at 515. We concluded under the facts of that case that the conditions of the statute had been met.

In contrast, we held in *Holm and Holm*, 132 Or App 440, 888 P2d 1077 (1995), that the grandfather in that case had not been denied reasonable visitation where he had been permitted to visit the child regularly and there was only the occasional denial of visitation. We said, "[T]here is no evidence that mother ever unreasonably refused to let grandfather visit the child." *Id*. at 442. *See also Sisson and Sisson*, 170 Or App 480, 13 P3d 152 (2000) (holding that it was not in

---

[1] We note that ORS 109.332 provides an alternative means for grandparent visitation, but that statute was not invoked here as a ground for visitation. There was no pending petition for step-parent adoption when grandmother filed her petition for visitation, as ORS 109.332 contemplates.

the best interests of a child to have contact with his grandparents at the time). Those cases demonstrate this court's understanding of the legislature's implicit intention that custodial parents have a right under ORS 109.121 to make reasonable decisions about their child's best interests and to limit and control the influences on their children's lives.

In this case, both parties presented detailed testimony about the amounts of time that child had spent with grandmother from 1995 through the dates of the hearing in 1998. Father submitted written calendars and records of child's visits with grandmother. Grandmother was afforded an average of eight days per month with child in 1995 and five days per month from 1996 to 1998. Grandmother's domestic partner estimated that child spent approximately 50 days during the year of 1997 with grandmother in her home, many of which were overnight stays. Also, grandmother was allowed to talk with child on the telephone freely. In addition, she visited with child at school during the lunch hour regularly, except after father requested in 1998 that the school limit the at-school interactions between child and grandmother. Grandmother and her family members also requested visitation for specific occasions such as birthday parties for other family members, which requests were occasionally granted. Sometimes, those requests were denied, or the visits were cut short by father. Grandmother had planned two trips on which she had wanted to take child, but father denied her requests. One trip would have caused child to miss four days of school, and one trip was to Disneyland. Father's reason for denying the trip to Disneyland with grandmother was that he wanted to take child there with his family.

Child's maternal great-grandmother testified that in the two months preceding trial, child had stayed with grandmother for two full weekends. Grandmother's partner testified that sometimes child would visit grandmother but stay with a maternal aunt and that that type of visitation occurred approximately five times in 1997 in addition to the overnight visits occurring at grandmother's home. Grandmother related how the typical arrangements for visitation with child are made:

"[W]e had [child] Monday and it was supposed to be from 9:00 to 4:00 and I—[child] called and—well, I called her and said that I'd be there at 9:00 in the morning. And then she called back and she said, 'Grandma, dad wants to talk to you.' And I said okay and so he said that she had an appointment at 4:00 so could he change it to 3:00 and I said sure. So it made it 8:00 to 3:00[.]'"

Grandmother also testified about how, typically, some of the denials of visitation occurred. She said:

"Q. Would you describe how you have to go about obtaining visitation with [child] presently and for the last period of time in the last two years.

"A. Well, [father] doesn't talk to me, hasn't talked to me for a long time. One time I called probably about a year-and-a-half or so ago and asked if I can have [child] and he said that he had other plans. And I said, well, how about next weekend? And he said, 'we have other plans.' And I said, '* * *, it's been about three weeks since we've seen [child.]' And he said, 'Look, * * *, [child] is my daughter and there's no judge in the country that's going to give you what you want.' And he started cussing me out * * *. From that time on I've had to talk to [stepmother] and ask her when we could have [child] so then she said well, she'll have to talk to [father]. And so then she says no, we're busy that weekend, we're busy that weekend, and so finally she'll call and say well, you can have her such and such a time, which gives me about two days notice. And lately, I'd say in the last few months, [child] is the one who calls me and says— when I call and ask if I can have her and she'll say well, I'll ask and so now it's [child] and I. She tells me—she'll call me and let me know when she can come."

The following testimony by child's aunt is characteristic of the tenor of grandmother's evidence about the denial of opportunities for visitation:

"Q. Now, there are times, are there not, that [grandmother] asks to have [child] for the weekend?

"A. Yes.

"Q. And she receives [child] for the weekend?

"A. Yes.

"Q. And there are also times that [grandmother] asks for [child] for the weekend where she does not receive [child] for the weekend?

"A. Yes."

Following the aunt's testimony was that of grandmother's partner, who testified:

"Q. Let me be more specific, Mr. Haecherl. What I'm trying to ask you is to describe the visitation schedule as you personally have observed it with [child.] How does it occur and how often does it occur?

"A. Well, [grandmother] calls and wants her and * * * most of the time don't get her when we want her or they got something to do and just like last Monday, we said well, get her from 9:00 o'clock and have her home at 5:00. And then before that we get her 3:00 o'clock on one day and have to take her back the next day, stuff like that. Once in a while we get her for a weekend."

In short, the record demonstrates that grandmother has had some difficulty in obtaining the visitation that she desires. Such conflicts are inevitable in any family relationship where parties have competing interests. Also, it is inferable that father may have acted intemperately at times when communicating with grandmother. That too is an ordinary consequence of a relationship like the one that exists between the parties. But ORS 109.121 requires more than what grandmother has shown here. The record does not demonstrate a pattern of denials of reasonable opportunities for grandmother to have contact with child such as would authorize a court to intervene. We agree with the trial court that as much contact as is reasonably possible ought to occur between child and grandmother. Ultimately, however, child is in father's custody, and the final decision as to whether a particular visit occurs rests with the custodial parent, so long as the best interests of child are not impinged upon and there is not a pattern of denial of reasonable contact. In conclusion, the record in this case does not persuade us that father has denied grandmother the reasonable opportunity to visit child within the meaning of the statute.

We need not discuss father's third assignment of error, in light of our rulings on the other issues.

Order of visitation under ORS 109.121 reversed; otherwise affirmed.